CHELSEA SQUARE TEXTILES, INC., Kenneth Lazar, Lester Gribetz, Plaintiffs–Appellees,

v.

BOMBAY DYEING AND MANUFAC-TURING COMPANY, LTD., Defendant–Appellant.

No. 98–9106.

United States Court of Appeals, Second Circuit.

Argued May 28, 1999.

Decided Aug. 23, 1999.

Douglas E. Edlin, Friedman Siegelbaum LLP, Roseland, NJ (Marc S. Friedman, Friedman Siegelbaum LLP, Roseland, NJ, of counsel), for Plaintiffs–Appellees.

Paul F. Doyle, Kelley Drye & Warren LLP, New York, N.Y. (Kathleen E. Groom, Kelley Drye & Warren LLP, New York, NY, on the brief), for Defendant–Appellant.

Before: KEARSE, WALKER, and POOLER, Circuit Judges.

JOHN M. WALKER, JR., Circuit Judge:

Defendant-appellant Bombay Dyeing and Manufacturing Company, Ltd. brings this interlocutory appeal pursuant to § 16(a) of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, from a July 23, 1998 order of the district court (Charles L. Brieant, *District Judge*). In its order, the district court denied Bombay Dyeing's motion to dismiss or stay the action and to compel arbitration in India and granted the cross-motion of plaintiffs-appellees Chelsea Square Textiles, Inc. ("Chelsea"), Kenneth Lazar, and Lester Gribetz (collectively, "the Chelsea Square plaintiffs") to enjoin the arbitration initiated by Bombay Dyeing in India. For the reasons that follow, we vacate the district court's stay of arbitration, reverse its decision denying Bombay Dyeing's motion to stay this action and compel arbitration, and direct the parties to proceed to arbitration pursuant to the rules of the Cotton Textile Export Promotion Council ("Texprocil") in Bombay, India.

## I. BACKGROUND

This case concerns the enforceability of an arbitration clause that appears on standardized sales confirmation forms used by an Indian textile manufacturer, Bombay Dyeing, in its trade with an American textile importer, producer, and re-seller, Chelsea Square Textiles, Inc. This appeal would present few difficulties if not for the fact that the arbitration clause at issue is so faint as to be nearly illegible and is so

garbled as to be almost unintelligible. Some much-needed background follows.

## A. *Prior Business Dealings*

Defendant-appellant Bombay Dyeing is an Indian corporation that manufactures and sells textiles throughout the world. Pursuant to Indian government regulations, all Indian textile companies, before they can export textiles, must obtain a Registration Cum Membership Certificate ("RCMC") from Texprocil, an agency sponsored by the Indian government. To obtain an RCMC, a company must agree to abide by a code of conduct and to use standard contract terms prescribed by Texprocil with respect to sales to overseas buyers. Among the standard terms and conditions required to be used by the exporting companies are those providing for the arbitration of all disputes arising from such contracts in accordance with the rules of arbitration set forth by Texprocil. It is not surprising, then, that arbitration has become a standard and customary trade practice for resolving disputes arising out of Indian textile exports.

Bombay Dyeing has used a standard "Confirmation of Cloth Sales" form (the "Confirmation") for all of its textile sales to overseas buyers for over twenty years. Typically, contracts for sale are consummated when Bombay Dyeing receives a purchase order from an overseas buyer and issues a Confirmation in response. The Confirmation bears the following legend: "We hereby confirm having sold to you goods as detailed below on the terms and conditions as stated herein and as printed overleaf." As suggested by the legend, printed on the back of the Confirmation are twenty-two paragraphs detailing the terms and conditions of the sale. These terms and conditions have remained largely unchanged over time, though the precise wording (and, in some instances, spelling or grammar) has varied. In English, paragraph 13 of the standard Confirmation's terms and conditions provides (all errors in original):

> All dispute and questions whatsoever which shall arise between the parties hereto out of or in connection with this contract of as to the construction of application thereof or the respective rights and obligation of the parties hereunder clause of thing herein contain or any account of valuation be made hereunder or as to any other matter in any way relating to these presents shall be referred to arbitration in accordance with rules for the time being in force as applicable to piece goods for export and which will be framed by The Cotton Textile Export Promotion Council in consultation with the Mills & Exporter Representatives selected in accordance with the provision therein. Nothing in the rules or arbitration or any implication thereof which runs counter to the terms and conditions of the contract shall be applied thereto.[1]

Beginning sometime in the late 1980s or early 1990s, Bombay Dyeing began doing business with James Pitts, who headed the North American division of a Japanese company called Kosen, Inc. While Pitts was employed at Kosen, Bombay Dyeing negotiated more than a thousand contracts with the company. In an evidentiary hearing held by the district court, Pitts testified that, on occasion, he saw Confirmation forms Bombay Dyeing sent in response to purchase orders submitted by Kosen.

In late 1991, Pitts left Kosen to found and become Chief Executive Officer of Rose Hill Linen Corporation. Pitts's wife, Nancy Pitts, was the Chief Operating Officer of Rose Hill. James Pitts testified that in its five years of existence, Rose Hill negotiated hundreds of contracts with Bombay Dyeing and a company he thought was Bombay Dyeing's corporate parent, Nowrosjee Wadia & Sons Ltd. ("Wadia"),[2]

---

**1.** As we state below, the version of paragraph 13 that appears in the Confirmation forms at issue in Bombay Dyeing's dispute with Chelsea varies slightly from the standard text.

**2.** The record is silent on the actual relation-

and that he personally saw Bombay Dyeing's Confirmations during that time. Pitts also acknowledged that he had signed at least one Confirmation from Wadia.[3]

Rose Hill subsequently filed for bankruptcy sometime in 1995. In early 1996, Pitts approached Bombay Dyeing's overseas sales agent to ascertain Bombay Dyeing's capacity for selling large quantities of textiles (250,000 to 500,000 yards) within a short time-frame to a new purchaser. Shortly thereafter, Pitts, along with plaintiffs Kenneth Lazar and Lester Gribetz, formed Chelsea Square Textiles, Inc., with substantial capital contributions from Lazar and Gribetz.[4] Although there is some dispute in the record, it appears that Nancy Pitts also worked for Chelsea as an "officer manager" of sorts.

Based on Bombay Dyeing's representations to James Pitts regarding its capacity, Chelsea in turn entered into an exclusive sales agreement with a retailer, Bed, Bath & Beyond ("BB & B"), under which Chelsea agreed to provide finished linen textile products, such as sheets, pillowcases and shams, to BB & B. These were to be supplied by Bombay Dyeing. The Chelsea Square plaintiffs contend that BB & B projected linen sales of between $3,500,000 to $7,000,000, stemming from the agreement.

**B.** *The Sales Confirmations and Arbitration Clauses at Issue*

After extensive negotiations between James Pitts and Bombay Dyeing, Chelsea sent purchase orders during the months of May, June, July and August of 1996 for goods with a total value of $458,055. According to plaintiffs' complaint, Bombay Dyeing accepted the orders in one of three ways: (1) by providing a formal, written Confirmation, (2) by providing informal, written confirmation through a responsive letter or fax transmission, or (3) by orally confirming its acceptance of the order. Bombay Dyeing contends that it responded to each purchase order by sending its standard Confirmation to Chelsea, several of which were received into evidence in original form at an evidentiary hearing held by the district court. The district court aptly described these Confirmations and the arbitration clause contained therein:

> Each of the Chelsea Confirmations is printed on translucent tissue style paper and bears a legend on the top of its face page which is identical to that found on the Wadia Confirmation ... The Chelsea Confirmations also bear on the back page what appear to be twenty-two numbered paragraphs entitled "Conditions," including at Condition 13 an arbitration clause similar to that found in the Wadia Confirmation. The presenta-

ship between Bombay Dyeing and Wadia. However, the Confirmation forms sent by Wadia are almost identical to those identified above as Bombay Dyeing's standard Confirmation form. Moreover, the Confirmation forms list what appears to be an identical address for both Wadia and Bombay Dyeing.

**3.** The Wadia Confirmation form has the same legend on the front of the form as the standard Bombay Dyeing Confirmation. And paragraph 13, although more confusing than the standard form's language, differs only slightly. It read (once again, with all errors in the original):

> All dispute and question whatever which shall arise between the parties here o out of or as to the construetions of application there of or the resp ctive right and obtigation of the parties hereunder clause or thing here in contain or any account of valuarion to be made hereunder or as any ather matter in any way relating to these presents shall be referred to arbitration in accordance with the for the same beiag in force as applicable to piece goods for export and which will be framed by The Cotton Textile Export Promotion Council in consultation with the Mills nnd Exporters Representative selected in accordance with the provision therein Nothing in the rules or arbitration or any implication there of which runs counter ta the terms and conditions of this contrace applied sher to.

**4.** James Pitts left Chelsea in May of 1997. Lazar and Gribetz are the only remaining principals at Chelsea.

tion of this clause ... is obscured by several printing defects. First, and most confusingly, the Conditions are arranged in columns juxtaposed in reverse order so that Conditions 1–12 are printed in the second of the two columns, with Conditions 14 through 22 appearing in the first. Condition 13 straddles both columns in reverse order, so that it begins in the lower right hand corner of the page, and concludes in the upper left hand corner. Second, the majority of the Chelsea Confirmations submitted by Bombay bear a first column which is printed partially off the page. Third, the Conditions are printed in type which is so faint as to border on the ephemeral, a condition which is compounded by the translucent nature of the tissue paper itself. Fourth, the details of the particular articles ordered by Chelsea are typewritten in heavy capitalized characters on the thin tissue of each Chelsea Confirmation's face page, effectively obliterating in places the faintly written Conditions on the reverse side.

Notwithstanding the foregoing disparaging comments regarding the Confirmation's legibility, the district court was able to reproduce the text of paragraph 13 which turned out to be no more well-written than its predecessors. Paragraph 13 reads (once again, with all errors in the original):

> All dispute and question whatever which shall rise between the parties here out of or as to the construction or application thereof or the respective right and obligation of the parties hereunder clause or things here in contain or any account of valuation to be made hereunder or as any other matter in any way relating to these presents shall be referred to arbitration in accordance with the for the same being in force as applicable to piece goods for export and which will be framed by the Cotton Textile Export Promotion Council in consultation with the Mills & Exporter Representatives selected in accordance with the provision there in nothing in the rules or arbitration or any implication

there of which runs counter to the terms of conditions of the contract shall be applied here to.

Nancy Pitts signed the front side of at least one of the Confirmations—that received by fax on May 5, 1996—and there is no dispute that the signed page bore the same legend found on all Bombay Dyeing Confirmations, namely "We hereby confirm having sold to you goods as detailed below on the terms and conditions as started (sic) herein and as printed overleaf." In an affidavit submitted to the district court, however, Nancy Pitts denied ever receiving or reading the reverse side of the form, and contended that she never had any discussions with Bombay Dyeing regarding arbitration as a means of dispute resolution. In fact, the Chelsea Square plaintiffs contend that no one at Chelsea ever saw the arbitration clauses at issue or discussed the possibility of arbitrating disputes with anyone from Bombay Dyeing.

### C. The Underlying Dispute

The underlying dispute in this case involves claims by the Chelsea Square plaintiffs that Bombay Dyeing failed to perform satisfactorily under the various contracts between the parties. Specifically, plaintiffs contend that certain goods ordered from Bombay Dyeing in April, 1996, were delivered late, and that others did not conform to those ordered—for example, top sheets were shipped without matching bottom sheets or pillowcases. Bombay Dyeing responds that Chelsea failed to pay for goods it actually received, and that Bombay Dyeing refused to complete the order until Chelsea paid for those goods.

### D. Proceedings Below

On September 30, 1997, the Chelsea Square plaintiffs informed Bombay Dyeing of their planned suit for breach of contract to recover lost profits arising from Bombay's failure to perform. In a response dated October 9, 1997, Bombay Dyeing informed Chelsea that it had initiated arbi-

tration proceedings in India under the auspices of Texprocil pursuant to paragraph 13 of the contract between the parties. A week later, Texprocil confirmed arbitration proceedings had been initiated and called upon Chelsea to appoint an arbitrator in accordance with Texprocil's rules. By letter dated December 1, 1997, Chelsea replied that it had never agreed to arbitrate any disputes with Bombay Dyeing and that it would not participate in the arbitration proceedings.

On December 5, 1997, the Chelsea Square plaintiffs filed this action in the Southern District of New York, asserting claims for, among other things, breach of contract, fraud, and negligent misrepresentation. On February 24, 1998, Bombay Dyeing moved to dismiss or stay the action and to compel arbitration in India pursuant to 9 U.S.C. § 206, which provides that "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." Plaintiffs opposed the motion and filed a cross-motion on March 16, 1998, to enjoin Bombay Dyeing from participating in the Indian arbitration.

In an unpublished July 23, 1998 Memorandum and Decision, the district court refused to stay the action and compel arbitration and enjoined Bombay Dyeing from pursuing the Indian arbitration. The district court concluded that its findings that the arbitration clauses relied upon by Bombay Dyeing were, "if not entirely illegible, ... virtually incomprehensible," had two consequences: (1) Chelsea's failure to understand the effect of the clauses was reasonable, and (2) Chelsea simply could not have assented to, or become bound by, those clauses as a matter of New York law. This interlocutory appeal followed.

On appeal, Bombay Dyeing contends that the district court erred in its analysis of New York law and, specifically, in its conclusion that the arbitration clause contained in the Confirmations was unenforce-able because it was illegible and unintelligible. For the reasons that follow, we agree.

## II. DISCUSSION

### A. Arbitration—General Principles Under the FAA

 The FAA was enacted to promote the enforcement of privately entered agreements to arbitrate, "according to their terms." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 54, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (internal citation and quotation marks omitted). Through the FAA, Congress has declared a "strong federal policy favoring arbitration as an alternative means of dispute resolution." *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir.1998). As a result, the Supreme Court has instructed that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). This bias in favor of arbitration, "is even stronger in the context of international transactions." *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1063 (2d Cir.1993). In determining whether a particular dispute is arbitrable, a court must engage in a two-part inquiry: it must decide (1) whether the parties agreed to arbitrate, and if so, (2) whether the scope of that agreement encompasses the asserted claims. *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 666 (2d Cir.1997). This case turns almost entirely on the first part of the inquiry—to wit, whether Chelsea agreed to arbitrate pursuant to paragraph 13 on the reverse side of the Confirmations at issue.

## B. Standard of Review

■ As noted above, the district court found that the parties did not agree to arbitrate disputes arising between them. Our precedent reveals some confusion regarding the appropriate scope of our review of such a finding. For example, in *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir.1999), we stated that "[w]e review the district court's conclusion as to the existence of an arbitration agreement for clear error," and cited our earlier decision in *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir.1987), in which we referred to a district court's finding that the parties had agreed to arbitrate disputes as a factual finding, subject to review for clear error, *see id.* (citing Fed. R.Civ.P. 52(a)). However, on another occasion, in *Oldroyd*, we held that we would review *de novo* all of the district court's determinations regarding the arbitrability of claims, including a finding as to whether the parties had agreed to arbitrate disputes in the first instance. *See* 134 F.3d at 75–76 (also citing *Genesco*, 815 F.2d at 846). We believe, and now hold, that the determination that parties have contractually bound themselves to arbitrate disputes—a determination involving interpretation of state law—is a legal conclusion subject to our *de novo* review, *see Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir.1996) ("The central issue—whether, based on the factual findings, a binding contract existed—is a question of law that we review *de novo*."); *Chrysler Credit Corp. v. Religa (In re Males)*, 999 F.2d 607, 609 (2d Cir. 1993) ("[W]e are not required to give deference to the district court's interpretation of the state law."), but that the findings upon which that conclusion is based are factual and thus may not be overturned unless clearly erroneous.

■ There is no question that, assuming the existence of an agreement to arbitrate, we review *de novo* the agreement's interpretation and scope. *See Oldroyd*, 134 F.3d at 76.

## C. Agreement to Arbitrate—Application of State Law

■ Section 2 of the FAA provides that a written arbitration provision in any contract involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Accordingly, "state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). However,

[a] state law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2. A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.

*Id.* (internal citations omitted); *see also Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). Thus, we have stated that while § 2 of the FAA preempts state law that treats arbitration agreements differently from any other contracts,[5] it also

---

**5.** One such rule, which we have already found to be preempted by the FAA because of its discriminatory treatment of arbitration provisions, is the so-called "New York Rule" of *Marlene Indus. Corp. v. Carnac Textiles, Inc.*, 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239 (1978). *See Progressive Cas. Ins.*, 991 F.2d at 46. In *Marlene*, the New York Court of Appeals held that the unilateral inclusion of an arbitration agreement materially alters a contract for the sale of goods, pursuant to N.Y. U.C.C. § 2–207(2)(b), and thus, cannot form part of the contract unless both parties expressly agree to it. *Marlene*, 45 N.Y.2d at 333, 408 N.Y.S.2d 410, 380 N.E.2d 239; *see also Schubtex Inc. v. Allen Snyder, Inc.*, 49 N.Y.2d 1, 6, 424 N.Y.S.2d 133, 399 N.E.2d 1154 (1979) (suggesting that "a provision for

"preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate." *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir.1993) (internal citation and quotation marks omitted). Accordingly, in determining whether the parties agreed to arbitrate in this case, the district court properly looked to general state law contract principles for guidance.

■ Plaintiffs do not, and cannot, dispute that Chelsea entered into a series of binding contracts with Bombay Dyeing for the purchase of textiles, irrespective of whether they or anyone employed at Chelsea actually read the terms and conditions printed on the reverse side of the Confirmations. In fact, at oral argument, plaintiffs' counsel went further, rightly conceding that if the arbitration clause found in paragraph 13 had been legible and clearly written, there is little question that plaintiffs would be bound to arbitrate their dispute with Bombay Dyeing. *See Level Export Corp. v. Wolz, Aiken & Co.*, 305 N.Y. 82, 87, 111 N.E.2d 218 (1953) (buyer could not avoid arbitration by claiming he was unaware of and never read arbitration provision incorporated in binding contract); *see also* N.Y. U.C.C. §§ 2–207(1)–(2) (written confirmation sent within reasonable time operates as acceptance even though it states additional terms; additional terms become part of contract between merchants unless they "materially alter" agreement, or notice of objection to additional terms is given within reasonable time); *Gaynor–Stafford Indus., Inc. v. Mafco Textured Fibers*, 52 A.D.2d 481, 384 N.Y.S.2d 788, 789–91 (App. Div., 1st Dep't 1976) (construing § 2–207 in context of agreement between textile merchants, and concluding that arbitration clause contained in written order acknowledgment did not "materially alter" agreement given

custom and practice of arbitration in industry).

Nonetheless, the Chelsea Square plaintiffs contend that the district court rightly found that Bombay Dyeing had not established that Chelsea had agreed to arbitrate disputes with it, given the district court's finding that the clause was illegible and unintelligible. We disagree.

We accept the district court's factual finding that the arbitration clause at issue was nearly illegible given certain printing defects and the fact that the clause was printed on very thin, tissue-style paper, which resulted in some of the text being obscured by typing on the reverse side. Nonetheless, the district court was able to reproduce the clause's text, with all of its defects. And, although the text itself is indeed garbled, we disagree with the district court's legal conclusion that the clause was unintelligible to a business like Chelsea that was operated by an experienced textile merchant, James Pitts, who had been purchasing textiles from Bombay Dyeing pursuant to the same basic sales Confirmation form for approximately a decade. *See Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir.1995) (evidence of trade usage and course of dealings between parties supported district court's finding of an agreement to arbitrate). The front of each Confirmation plainly informed the textile buyer that any sale would be governed by the terms and conditions printed on the reverse side.

We believe that a textile buyer is generally on notice that an agreement to purchase textiles is not only likely, but almost certain, to contain a provision mandating arbitration in the event of disputes, and must object to such a provision if it seeks to avoid arbitration. *See Helen Whiting, Inc. v. Trojan Textile Corp.*, 307 N.Y. 360, 367, 121 N.E.2d 367 (1954) ("From our own experience, we can almost take judi-

arbitration could in a proper case be implied from a course of past conduct or the custom

and practice in the industry").

cial notice that arbitration clauses are commonly used in the textile industry ...."); *see also In re Gaynor–Stafford,* 384 N.Y.S.2d at 790–91; *Leadertex,* 67 F.3d at 25; *Pervel Indus., Inc. v. T M Wallcovering, Inc.,* 871 F.2d 7, 8 (2d Cir.1989) (holding that textile buyer was bound by purchase order confirmations containing an arbitration clause where buyer did not object to provision, in part on the ground that arbitration clauses are "widespread" in textile industry); *Imptex Int'l Corp. v. Lorprint, Inc.,* 625 F.Supp. 1572, 1572 (S.D.N.Y.1986) ("The New York courts have repeatedly held that, as arbitration clauses are commonly used in the textile trade, a textile buyer's failure to object to an arbitration clause upon receipt of both the sales agreement signed by the seller and the initial shipment of goods binds the buyer to the arbitration clause.").

For these reasons, we hold that Chelsea was bound by the arbitration clause printed on the reverse side of the Bombay Dyeing Confirmations to which it did not object. Moreover, although the clause does not state that the arbitration is to take place in India, it does state that arbitration is to be conducted in accordance with rules "framed by The Cotton Textile Export Promotion Council [Texprocil]," which, in turn, mandate that the arbitration be held in Bombay, India.

## CONCLUSION

Accordingly, we vacate the district court's stay of arbitration, reverse its decision denying Bombay–Dyeing's motion to stay the action and compel arbitration, and direct the parties to proceed to arbitration pursuant to the rules set forth by Texprocil in Bombay, India. Costs shall be borne by appellees.