SMOOTHLINE LTD. and Greatsino Electronic Ltd., Petitioners–Appellees,

v.

NORTH AMERICAN FOREIGN TRADING CORP., Respondent–Appellant.

Nos. 00–7994, 00–7966.

United States Court of Appeals, Second Circuit.

Argued Feb. 8, 2001.

Decided May 07, 2001.

James L. Brochin, Gage & Pavlis, New York, N.Y. (Nora A. Henke, on the brief) for Petitioners–Appellees.

Richard H. Dolan, Schlam Stone & Dolan, New York, N.Y. (Jeffrey M. Eilender, on the brief) for Respondent–Appellant.

Before VAN GRAAFEILAND, CALABRESI & SOTOMAYOR, Circuit Judges.

VAN GRAAFEILAND, Senior Circuit Judge:

As Judge Feinberg observed in *Conticommodity Serv., Inc. v. Philipp & Lion,* 613 F.2d 1222, 1224 (2d Cir.1980), "Arbitration is intended to provide the parties to a dispute with a speedy and relatively inexpensive trial before specialists." Despite this well-recognized fact, courts continue to be confronted with herculean efforts to avoid resolution of disputes through arbitration. This is such a case.

During the 1990's, appellant North American Foreign Trading Corp. ("NAFT"), a closely-held corporation headquartered in New York, contracted with manufacturers in the Far East for the production of cordless telephones. One of NAFT's main customers was BellSouth Corporation. NAFT paid its Far East manufacturers to produce cordless telephones, which were labeled with the BellSouth brand, shipped to NAFT, and delivered to BellSouth. The telephones were then sold to the public. Smoothline Ltd. ("Smoothline") is a Hong Kong corporation that manufactured telephones for NAFT.

Smoothline and NAFT state that their commercial relationship commenced around 1989. The specifics of their relationship at that time are unclear, because the parties have not supplied any written documents from that period. It appears, however, that NAFT and Smoothline had an informal and partly oral understanding that NAFT would order cordless phones, which were branded under the BellSouth label, from Smoothline, and that Smoothline would deliver the telephones to NAFT. It further appears that Smoothline agreed to replace defective phones returned by customers. The parties called such defective phones "Customer Returned Units" or "CRUs."

In 1993, Smoothline found it necessary to hire subcontractors to produce a portion

of the telephones NAFT ordered. Smoothline therefore negotiated with P.T. Welback, Indonesia and P.N. Electronic Ltd. of Hong Kong. P.T. Welback and P.N. Electronic are subsidiaries of Welback Holdings Ltd., a Hong Kong company. These three companies are hereinafter referred to as the "Welback companies."

Smoothline sought NAFT's permission to hire the Welback companies as subcontractors, and to have NAFT pay the Welback companies through letters of credit. NAFT agreed, but required written guarantees from Smoothline and the Welback companies. On March 31, 1993, the parties entered into an "Agreement and Guaranty." Because the March 31 agreement contains the arbitration clause at issue herein, and the meaning of that clause can best be understood when viewed in context, we reproduce the pertinent terms of the agreement at some length. In the agreement, Smoothline is referred to as "Manufacturer" and Welback Holdings is referred to as "Supplier." The agreement provides, in relevant part:

*WITNESSETH:*

WHEREAS, Manufacturer and NAFT have heretofore entered into various agreements whereunder Manufacturer has agreed to manufacture certain telephone equipment and electronic goods for NAFT; and

WHEREAS, Manufacturer has requested NAFT to open letters of credit directly to the order of P.N. Electronic, Ltd., a subsidiary of Manufacturer's Supplier, in order to assist Manufacturer in complying with its obligations under the agreements between NAFT and Manufacturer; and

WHEREAS, NAFT is willing to assist Manufacturer and to open letter [sic] of credit to said subsidiary of Manufacturer's Supplier, provided that both Manufacturer and Supplier give NAFT adequate assurances and guarantees protecting NAFT's interest in the matter; and

WHEREAS, the parties wish to record their understandings as to the terms and conditions on which NAFT will open letter [sic] of credit to the order of a subsidiary of Manufacturer's Supplier;

NOW, THEREFORE ... the parties hereto agree as follows:

1. *Funding of the Supplier.* NAFT agrees to open an initial letter of credit to the order of P.N. Electronic Ltd., a Hong Kong company to be formed by Supplier as a wholly-owned subsidiary of Supplier.... If Manufacturer and Supplier fully and completely perform their obligations to NAFT under the terms of NAFT's agreements with Manufacturer, including particularly but without limitation, (a) Manufacturer's obligation to produce and deliver the highest quality electronic and telecommunications equipment; (b) Manufacturer's obligation to meet all production and delivery schedules; and (c) Manufacturer's obligation to repair and replace, at no cost to NAFT, any defective goods returned by NAFT to Manufacturer, then NAFT agrees to open additional letters of credit to the order of Supplier, or a subsidiary of Supplier ...

2. *Assumption of Obligation.* Supplier, P.T. Welback Indonesia and P.N. Electronic Ltd. each hereby agrees to accept[,]abide and be bound by all of the terms and conditions of NAFT's agreements with Manufacturer, including particularly but not limited to, (a) Manufacturer's obligation to produce and deliver the highest quality electronic and telecommunications equipment, free of all manufacturing defects; (b) Manufacturer's obligation to meet all production and delivery schedules, and to devote

specific production facilities on a first priority basis for the purpose of manufacturing and delivering the products to be ordered by NAFT; and (c) Manufacturer's obligations to repair or replace, at no cost to NAFT, any defective goods returned by NAFT to [M]anufacturer, and to return to NAFT said repaired or replacement goods, at no cost to NAFT, in brand-new condition, and in new packaging, within 60 days of Manufacturer's receipt of the defective goods.

3. *Supplier's Obligations to NAFT.* . . .

4. *Guarantees.* Manufacturer . . . guarantee[s] to NAFT the full, complete and timely performance of all obligations owed to NAFT by Supplier, P.T. Welback Indonesia and P.N. Electronic Ltd. . . .

5. *Confidentiality.* . . .

6. *Miscellaneous.* . . . The resolution of any dispute between the parties with respect to the subject matter of this Agreement and Guarantee shall be settled by arbitration before the American Arbitration Association in New York, New York, applying the law of New York without regard to conflicts of law principles. This Agreement sets forth the entire understanding between the parties with respect to its subject matter, and extinguishes all prior agreement [sic], understandings or discussions with respect thereto. . . .

In December 1993, NAFT and Smoothline entered into another agreement. The December agreement took the form of a letter from NAFT to Smoothline. NAFT wrote:

This will serve to confirm our understanding with respect to (1) Smoothline's obligation to repair or replace, at no cost to us, the telephones which have been, and in the future will be, returned by us to Smoothline; and (2) our obligation to pay Smoothline for the tooling which you made at our request and are using in the manufacture of goods for us.

Despite our existing agreements, Smoothline has not been able to repair or replace the telephones which we have returned for rehauling on a timely basis. Normally, we would insist that you reimburse us for the cost of those goods, either by an immediate payment or by letter of credit. Smoothline has told us, however, that it cannot afford to do so, and we are willing to cooperate with you.

Accordingly, so long as you have not returned or replaced the telephones which have been, and in the future will be, returned to Smoothline for rehauling, we will not be obligated to pay you on a current basis for the tooling. When and if you have fully performed your obligations to repair or replace, at no cost to us, the telephones for rehauling, then we will be obligated to perform our obligation to you to pay for the said tooling.

Smoothline agreed to the terms by signing the bottom of the letter.

Following the March 1993 agreement, NAFT began receiving telephones manufactured by the Welback companies. Smoothline also continued to supply NAFT with telephones manufactured directly by Smoothline. NAFT alleges that a high percentage of the phones produced by Smoothline and the Welback companies were defective. NAFT further alleges that both Smoothline and the Welback companies failed to repair or replace CRUs in a timely manner.

NAFT alleges that, although the Welback companies failed to replace CRUs in a timely manner, NAFT sought to accommodate the Welback companies by agreeing that the Welback companies could re-

pair or replace CRUs at the rate of 35,000 per month. NAFT alleges that the Welback companies failed to repair or replace CRUs at this rate. Accordingly, in early September 1996, NAFT reduced the amount of payment owed the Welback companies by the value of the unrepaired CRUs.

On September 20, 1996, the Welback companies brought suit against Smoothline in the Supreme Court of Hong Kong. The Welback companies claimed that, because NAFT refused to pay them, Smoothline was required to pay the purchase price of telephones manufactured for NAFT. Smoothline appeared as a defendant, and in July 1997 brought NAFT into the case as a third party.

Prior to being brought into the Hong Kong action as a third party, NAFT had demanded arbitration with the Welback companies. In August 1997, shortly after having been brought into the Hong Kong action by Smoothline, NAFT demanded arbitration with Smoothline as well. Although the Welback companies and Smoothline initially resisted NAFT's demands for arbitration, in July 1998 the Welback companies and Smoothline agreed to arbitrate their disputes with NAFT regarding phones manufactured by the Welback companies.[1] We are informed by the parties that these arbitrations have not been completed.

In 1997, NAFT began placing orders for 900 megahertz cordless telephones with Smoothline. Smoothline informed NAFT that it desired to have Greatsino Electronic Ltd. ("Greatsino") produce these phones. Greatsino and Smoothline are sister corporations which are indirectly owned by Universal Appliances Ltd. ("UAL"), a publicly traded Hong Kong corporation. NAFT had no objection to having Greatsino manufacture the phones, because, NAFT alleges, Smoothline executives informed NAFT that Greatsino was managed by the same personnel who ran Smoothline.

NAFT paid Greatsino, as it had paid Smoothline and the Welback companies, through letters of credit. NAFT's bank, F.H.A. Handelsanstalt, based in Schaan, Liechtenstein, ordered the issuing bank, Barclays Bank AG, based in Zurich, Switzerland, to open letters of credit with Greatsino as the beneficiary. Hang Seng Bank Ltd., based in Hong Kong, was the confirming bank. Within the letters of credit, under the heading "Special Conditions," Barclays stated the following regarding arbitration: "We are informed that any dispute arising out of any transaction of this letter of credit will be settled through the American Arbitration Association in New York City or the Supreme Court of New York, at NAFT's option." When Greatsino surrendered documents to obtain payment under the letters of credit, the documents included a "Sworn Certificate," guaranteeing "everything which is written of [sic] this LC."[2]

NAFT alleges that, similar to its experience with phones manufactured by

---

**1.** NAFT claims that, when Smoothline agreed to arbitration in July 1998, it agreed to arbitrate all disputes it had with NAFT, rather than only disputes arising from phones manufactured by the Welback companies. In light of our conclusion that Smoothline is required by the March 1993 agreement to arbitrate disputes relating to phones manufactured directly by Smoothline, we need not consider NAFT's argument.

**2.** The letters of credit issued for the benefit of Smoothline contained similar statements of Barclays's understanding and similar certifications from Smoothline. Because we determine that Smoothline is obligated, under the March 1993 agreement, to arbitrate the relevant disputes with NAFT, we need not discuss whether Smoothline is required to arbitrate by virtue of the letters of credit.

Smoothline and the Welback companies, a large percentage of the phones manufactured by Greatsino suffered from manufacturing defects. NAFT alleges it eventually stopped ordering phones from Greatsino and demanded that Greatsino repair or replace the stockpiled CRUs.

On December 29, 1999, Smoothline and Greatsino began proceedings in the Princely District Court of Liechtenstein. Smoothline and Greatsino sought damages for NAFT's alleged failure to pay its portion of the tooling charges, and also sought a declaration that, *inter alia,* they had no obligation to repair or replace CRUs.

On February 28, 2000, NAFT demanded arbitration of its dispute with Greatsino and UAL. As was recounted above, in 1997 NAFT had demanded arbitration against Smoothline. On March 13, 2000, Smoothline and Greatsino applied for an order from the district court, pursuant to 28 U.S.C. § 1782, to conduct discovery for use in the Liechtenstein action. On March 27, 2000, NAFT responded by cross-petitioning the district court to compel Smoothline and Greatsino to participate in arbitration, and to enjoin them from continuing the Liechtenstein action.

Also on March 27, 2000, UAL and Greatsino petitioned the Supreme Court, New York County, to stay the arbitrations brought against them by NAFT. NAFT responded by removing the action to the district court. The removed action was consolidated with the § 1782 petition and NAFT's cross-petition to compel arbitration and enjoin Smoothline and Greatsino from proceeding in Liechtenstein.

The district court denied NAFT's cross-petition and denied, without prejudice, Smoothline and Greatsino's § 1782 petition. The district court did not rule on the removed matter.

In denying NAFT's cross-petition, the district court first concluded (and NAFT does not disagree) that NAFT sought arbitration with regard to phones manufactured by Smoothline and Greatsino, not to phones manufactured by the Welback companies. The district court then recognized the "strong federal policy favoring arbitration." *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.,* 189 F.3d 289, 294 (2d Cir.1999) (internal quotation marks omitted). The district court also recognized that "any doubts about the scope of arbitrable issues should be resolved in favor of arbitration," *id.* (internal quotation marks omitted), and that this presumption "applies with special force in the field of international commerce." *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.,* 923 F.2d 245, 248 (2d Cir.1991) (internal quotation marks omitted). Nonetheless, the district court determined that disputes regarding phones manufactured by Smoothline and Greatsino were not arbitrable under the March 1993 agreement. The district court reasoned:

> [T]he Court concludes that the Agreement is clear, and that the present dispute is not arbitrable thereunder. The scope of the arbitration clause is limited to the "subject matter" of the Agreement. That subject matter is NAFT's provision of letters of credit to Smoothline's suppliers. Although the Agreement makes reference to the underlying agreements between NAFT and Smoothline, and makes Smoothline's performance of those obligations a condition precedent to NAFT's performance under the Agreement, it evidences no intent to incorporate those agreements. The Agreement is not the source of NAFT and Smoothline's independent obligations to perform the obligations underlying their relationship. Where the Agreement itself is clear, the strong presumption in favor of arbitration does

not require the distortion of the Agreement that NAFT advocates.

The district court also rejected NAFT's argument that Smoothline and Greatsino were bound to arbitrate because they guaranteed everything written in the letters of credit, including Barclays's understanding that the disputes were arbitrable. The district court stated:

> Nor can NAFT cobble an agreement to arbitrate from the Letters of Credit issued by Barclays Bank for the benefit of Smoothline.... This statement of the bank's understanding of a separate agreement cannot in itself give rise to an obligation to arbitrate. *See North American Foreign Trading Corp. v. P.T. Kodeco Electronics*, 236 A.D.2d 324, 654 N.Y.S.2d 136, 137 (1st Dept.1997) ... Nor does Smoothline's accompanying certification ... create of that provision an affirmative obligation to arbitrate.

Having determined that it would deny NAFT's cross-petition, the district court then considered the § 1782 petition. The district court denied the initial petition as requesting overly broad discovery, but allowed Smoothline and Greatsino to submit a revised request. NAFT then appealed "from so much of the order ... as denied NAFT's application to compel arbitration of the dispute between Petitioners and Respondent NAFT." The district court stayed, pending the outcome of this appeal, the discovery that Smoothline and Greatsino sought.

## DISCUSSION

### I. NAFT–Smoothline Disputes

■ The Supreme Court has directed that we are to construe the scope of arbitration clauses broadly. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (instructing that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). This presumption in favor of arbitration "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

■ Of course, the parties may limit by agreement the claims they wish to submit to arbitration. If the parties make such an intention clear, the federal policy favoring arbitration must yield. "Federal policy alone cannot be enough to extend the application of an arbitration clause far beyond its intended scope." *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 831 (2d Cir.1988) (internal quotation marks omitted).

■ The March 1993 agreement requires arbitration of "any dispute between the parties with respect to the subject matter of this Agreement and Guarantee." The district court determined that the subject matter of the contract did not include disputes over whether Smoothline, with respect to phones manufactured by it, was required to produce high quality phones and repair or replace CRUs. This, we conclude, was error.

The March 1993 agreement does not contain a definition of the term "subject matter." NAFT argues that, absent a contractual definition, it is appropriate to consider dictionary definitions of the term. *C.f., Kerin v. United States Postal Serv.*, 116 F.3d 988, 991–92 (2d Cir.1997). We agree.

Webster's defines "subject matter" as, *inter alia*, "matter presented for consideration." *Webster's Third New International Dictionary* 2276 (1971). Smoothline accepts this definition. Smoothline's obli-

gations to produce quality phones and to repair or replace CRUs are "considered" in the March 1993 agreement because the agreement expressly conditions NAFT's obligations on Smoothline's continuing to perform its obligations under the oral understandings. For example, NAFT is not required to open additional letters of credit in favor of the Welback companies unless Smoothline delivers the highest quality electronic goods and repairs or replaces all CRUs at no cost to NAFT.

It is clear from the district court's discussion that it thought the subject matter of the March 1993 agreement was limited to the motivating purpose behind the agreement, namely, Smoothline's desire to engage the Welback companies, as subcontractors, to manufacture goods for, and be paid by, NAFT. While the district court's definition of "subject matter" as "purpose" is not unreasonable, it is not the only reasonable definition. Reversal is required since it cannot be said "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 847 (2d Cir.1987) (internal quotation marks omitted).

We need not decide whether obligations that were merely referenced in the March 1993 contract, without being made conditions precedent, are part of the subject matter of the contract. Smoothline's obligations to produce and deliver the highest quality electronic and telecommunications equipment, to meet all production and delivery schedules, and to repair or replace, at no cost to NAFT, any defective goods returned by NAFT to Smoothline, are conditions precedent to NAFT's performance under the March 1993 contract. There-

fore, disputes over Smoothline's performance of these obligations must be submitted to arbitration.[3]

NAFT only appealed from that portion of the district court's order which denied NAFT's petition to compel arbitration. Arguably then, the limited scope of NAFT's appeal does not allow us to consider the propriety of the district court's denial of NAFT's petition to enjoin Smoothline from proceeding in Liechtenstein. *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 256 (2d Cir.1995). However, our determination that Smoothline is required to arbitrate its disputes with NAFT regarding Smoothline's obligations to produce high quality phones and to repair or replace CRUs necessarily means that Smoothline may not continue the Liechtenstein suit insofar as Smoothline seeks to challenge the validity of these obligations in that suit. Therefore, on remand, the district court should grant NAFT's petition insofar as NAFT seeks to enjoin Smoothline from litigating these issues in Liechtenstein.

The December 1993 agreement presents a separate question. That agreement, which contains no arbitration clause, provides that NAFT is not required to pay Smoothline's tooling costs until Smoothline repairs or replaces outstanding CRUs. In the Liechtenstein action, Smoothline alleges that NAFT failed to pay its share of Smoothline's tooling costs and seeks damages for this alleged breach. We have already determined that the issue of whether Smoothline is under any obligation to repair or replace CRUs is a matter that must be submitted to arbitration. NAFT argues that its obligation to pay Smoothline's tooling costs is "inextricably linked" with the CRU issue, and that

---

**3.** In describing Smoothline's "obligations," we do not foreclose any challenges Smoothline may raise to the validity or content of these obligations. However, any challenges Smoothline may wish to present must be considered in arbitration.

the tooling dispute must thus also be submitted to arbitration. Because the district court did not have occasion to consider this argument, we remand for the district court to confront this argument in the first instance, taking into account our construction of the "subject matter" of the agreement. We express no opinion as to the argument's validity.

## II. NAFT–Greatsino/Universal Disputes

NAFT argues that, even though neither Greatsino nor Universal signed the March 1993 agreement, they are nonetheless bound by the arbitration clause of the agreement because they are alter egos of Smoothline. Because the district court concluded that Smoothline was not required to arbitrate issues relating to phones manufactured directly by Smoothline, the court did not reach this argument.

On remand, the district court should consider whether Greatsino and Universal, though nonsignatories, are nonetheless required to arbitrate pursuant to *Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 777 (2d Cir.1995).[4] In conducting this inquiry, the district court should consider whether Greatsino's "guarantee" of everything written on the letter of credit, including Barclays's understanding that disputes arising out of the letter of credit are arbitrable, is relevant to the *Thomson* analysis. We express no opinion as to the proper outcome of the *Thomson* inquiry in general, or to the proper import, if any, of the letter of credit guarantee.

Assuming the district court determines that Greatsino and Universal are not bound under *Thomson,* the district court should reconsider its conclusion that the guarantee provides no independent basis for arbitration. We find the issue to be rather more complicated than the district court's analysis suggests. On the one hand, there are several considerations militating against arbitration. First, the guarantee appears to be unilateral. That is, although Greatsino signed the guarantee, it is difficult to conceive how NAFT could be bound, because it did not sign the letter of credit. Second, it is difficult to understand how Greatsino could have guaranteed Barclays's understanding. Third, the arbitration reference in the letter of credit, which allows for arbitration before the AAA or in New York state court, at NAFT's option, is at odds with the arbitration clause of the March 1993 contract, which requires arbitration before the AAA. On the other hand, Greatsino did sign the guarantee, and we normally give effect to such provisions.

## CONCLUSION

The order of the district court denying the cross–petition is reversed and the matter is remanded for proceedings consistent with this opinion.

---

4.  NAFT also argues that Greatsino and Universal are vicariously bound under the "closely related" test established by the Seventh Circuit in *Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209 (7th Cir .1993). In *Hugel,* the Seventh Circuit explained the test for binding a non-party to a forum selection clause. NAFT argues that the *Hugel* test is equivalent to this Circuit's test for binding nonsignatories to an arbitration clause. This equation is without support in our cases and we decline to adopt it here. Accordingly, on remand, the district court should only determine whether Greatsino and Universal are required to arbitrate under *Thomson.*