**Peter J. DAPUZZO, Plaintiff,**

v.

**GLOBALVEST MANAGEMENT COMPANY, L.P. and Utilitivest II, L.L.C., and Utilitivest II, L.P., Defendants.**

No. 02 Civ. 8594.

United States District Court, S.D. New York.

June 11, 2003.

Stephanie B. Adwar, Levi, Lubasky & Feigenbaum, L.L.P., New York, NY, for Peter J. DaPuzzo.

### DECISION AND AMENDED ORDER

MARRERO, District Judge.

Plaintiff Peter J. DaPuzzo ("DaPuzzo") brought this action against defendants Globalvest Management Company, L.P. ("Globalvest"), Utilitivest II, L.L.C. ("Utilitivest LLC") and Utilitivest II, L.P. ("Utilitivest LP" or the "Fund") (collectively, "Defendants"), alleging fraudulent inducement in connection with an investment DaPuzzo made in the Fund. Defendants moved, pursuant to the Federal Arbitration Act (the "FAA" or the "Act"),[1] 9 U.S.C. § 1 *et seq.*, to stay this action and compel arbitration in the Bahamas pursuant to a provision of the partnership agreement governing the Fund. Alternatively, Defendants seek to dismiss the complaint for lack of subject matter or personal jurisdiction as to some or all of the Defendants, or for failure to state a claim. DaPuzzo cross-moved to compel arbitration in New York. On May 31, 2003 the Court issued a Decision and Order granting Defendants' motion to stay this action and indicated that its findings, reasoning and conclusions would be set forth in a separate Decision and Order to be made available to the parties. Accordingly, for the reasons discussed below, De-

---

**1.** *See infra* note 5 for elaboration and more specific definitions of the Court's references to the FAA.

fendants motion to stay this action is granted and DaPuzzo's motion to compel arbitration is denied.

## I. *FACTS*

DaPuzzo alleges that in May of 1998 he met on two occasions with Harold Lindenthal ("Lindenthal"), of Berkeley Global Associates, Inc., and Peter Gruber ("Gruber"), a principal of Utilitivest LLC and Chair and President of Globalvest.[2] The meetings took place in DaPuzzo's office at Cantor Fitzgerald & Co. in New York, where he served as a co-president of institutional equity sales and trading. On those occasions, Lindenthal and Gruber sought DaPuzzo's investment in Utilitivest LP, a venture capital fund.

On May 26, 1998, DaPuzzo agreed to purchase a limited partnership interest in the Fund in the amount of $1 million, with an initial capital contribution of $400,000 upon subscription and two subsequent installments of $300,000 each, to be paid on November 24, 1998 and March 1, 1999, respectively. In this connection, DaPuzzo signed a Subscription Agreement (the "Subscription Agreement") committing him to make the capital payments as scheduled. (*See* Subscription Agreement, attached as Exhibit 2 to the Notice of Motion dated January 8, 2003.) DaPuzzo acknowledges having received on that occasion a copy of a Confidential Information Memorandum detailing the terms and conditions governing the Fund. (*See* Confidential Information Memorandum Dated March 9, 1998 (the "CIM"), attached as Exhibit 1 to the Notice of Motion.) In signing the Subscription Agreement, DaPuzzo represented that he had received and read a copy of both the CIM and the Fund's partnership agreement. (*See*

Amended and Limited Restated Partnership Agreement for Utilitivest II, L.P. (the "Partnership Agreement"), attached as Exhibit 3 to the Notice of Motion.) At the same time, by his execution of the Subscription Agreement, DaPuzzo appointed the President and Director of Utilitivest LLC as his attorney-in-fact to sign the Partnership Agreement on his behalf.

DaPuzzo made the capital contributions called for by the Subscription Agreement by the dates specified. He acknowledges that he was provided a copy of the Partnership Agreement on March 22, 2001, and personally executed it soon thereafter. (*See* Notice of Motion, Ex. 4, at 32.)

The CIM includes a paragraph, under a heading of "Disputes" in a section entitled "Summary of the Partnership Agreement," that states: "The Partnership will be governed under the laws of the Cayman Islands. Any disputes will be settled by binding arbitration according to the rules and regulations of the American Arbitration Association." (Notice of Motion, Ex. 1, at 43.)

The Partnership Agreement, however, contains an arbitration clause, stating in relevant part that:

Any controversy between the Partners involving the construction or application of any of the terms, covenants, or conditions of this Agreement will be submitted to arbitration in the Bahamas on the request of the Partnership or any Partner, and the arbitration will comply with and be governed by the rules and procedures of the International Chamber of Commerce, as amended from time to time; provided, however, that nothing in this Section will constitute a waiver of any right any party to this Agreement

2. Utilitivest LLC is the Fund's general partner and Globalvest is the Fund's Investment Manager and majority owner of Utilitivest LLC.

may have to choose a judicial forum to the extent such a waiver would violate applicable law.

(*Id.* Ex. 3 ¶ 13.12, at 31.) In another paragraph, the agreement stipulates that it is governed by the laws of the Cayman Islands. (*Id.* ¶ 13.10, at 30.)

DaPuzzo alleges that at each of his two meetings with them, Lindenthal and Gruber represented and he understood that an investment in the Fund was subject to a three-year "lockup" period, after which investors would be free to redeem some or all of their capital contributions. This representation, according to DaPuzzo, was also made in summary materials prepared by Globalvest for promotion of the Fund that were handed to him by Lindenthal and Grubner prior to his subscription. (*See* Utilitivest II, L.P., attached as Exhibit A to the Affidavit of Peter J. DaPuzzo dated January 23, 2003 ("DaPuzzo Aff."), attached as Exhibit 2 to the Affidavit of Steven B. Feigenbaum dated January 30, 2003, at 3, 5.)

In June of 2001 DaPuzzo, through the Ayco Company ("Ayco"), his investment advisor, requested a full redemption of his $1 million investment. He alleges that Globalvest informed Ayco that the funds could not be returned at that time but that the request should be renewed toward the end of the year.

Globalvest responded to DaPuzzo in November 2001 that his capital could not be withdrawn after three years, but remained committed at the discretion of Utilitivest LLC, in accordance with the terms of the parties' agreements, for a period of between five and fifteen years. In support, Defendants cite and interpret a provision of the Partnership Agreement specifying that investments in the Fund were subject to a two-year commitment period (the "Commitment Period"), during which partners could be called upon to make addi-tional capital contributions, and that liquidation of the Fund's assets was anticipated to commence three years after the Commitment Period, thus—at the earliest—five years following the limited partner's initial investment. (*See* Notice of Motion, Ex. 3, ¶¶ 2.6 and 3.2, at 7 and 9.)

Asserting that he was fraudulently induced to invest in the Fund by misrepresentations made to him by Lindenthal and Gruber prior to his execution of the relevant documents, DaPuzzo then commenced this action, allegedly after Defendants declined his request to arbitrate before the AAA. Defendants contend that the pertinent provisions of the parties' contract do not allow withdrawals until the period specified in the Partnership Agreement; and that DaPuzzo's claim therefore entails the construction and application of the terms and conditions of the Partnership Agreement and is subject to arbitration under the relevant provision of that document. Hence, Defendants move to stay this action and compel arbitration in the Bahamas, or to dismiss the complaint on jurisdictional grounds or for failure to state a claim.

Relying on the arbitration language contained in the CIM, DaPuzzo cross-moves to compel arbitration in New York under the rules of the American Arbitration Association (the "AAA").

## II. *DISCUSSION*

### A. *THE FEDERAL ARBITRATION ACT*

As a threshold matter, the Court notes that federal policy unequivocally encourages arbitration as an alternative means of dispute resolution. *See David L. Threlkeld & Co. v. Metallgesellschaft Ltd.,* 923 F.2d 245, 248 (2d Cir.1991) (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917,

104 L.Ed.2d 526 (1989)); *see also Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir.1998). This "liberal federal policy favoring arbitration agreements" is manifested in the FAA, which requires courts to compel arbitration where the parties have contractually committed to resolve by arbitration matters within the scope of their agreement. *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." (citing 9 U.S.C. §§ 3, 4) (emphasis in original)); *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 844 (2d Cir.1987).

Reinforcing the FAA's mandate, the Supreme Court has instructed that courts apply the statute in accordance with ordinary contract principles, "with a healthy regard" for the Act's underlying policy, to this end resolving any doubts concerning the scope of arbitrable issues in favor of arbitration, whether the issue at hand is a construction of the language of the agreement itself, or a defense to arbitrability. *See Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. 927; *see also Chelsea Square Textiles, Inc. v. Bombay Dyeing and Mfg. Co., Ltd.*, 189 F.3d 289, 294 (2d Cir.1999). This bias in favor of arbitration "is even stronger in the context of international business transactions." *Threlkeld*, 923 F.2d at 248 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 629–31, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)); *see also WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir.1997) ("[T]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted disputes. Doubts should be resolved in favor of coverage." (citations omitted; internal quotations omitted)); *Associated Brick Mason Contrs. of Greater N.Y., Inc. v. Harrington*, 820 F.2d 31, 35 (2d Cir.1987) (quoting *AT & T Technologies, Inc. v. Communications Wkrs. of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). In applying this policy, the role of a court reviewing disputes potentially encompassed by arbitration provisions is limited to ascertaining two threshold inquiries: "whether a valid agreement or obligation to arbitrate exists, and ... whether one party to the agreement has failed, neglected or refused to arbitrate, in whole or in part." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir.1996) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)).

Here, the parties do not disagree that their dispute is subject to arbitration under the terms of the agreements that define their relationship and that govern the attendant investment transaction which gave rise to this action. For the purposes of the motions now before the Court, the litigants' only relevant difference pertains to the venue and applicable arbitration rules.

## B. DEFENDANTS' MOTION

Defendants' motion to stay this action and compel arbitration was filed pursuant to Chapter 1 of the FAA, 9 U.S.C. § 1 *et seq.* They contend that DaPuzzo's claim regarding the circumstances surrounding his investment in the Fund raises an issue that implicates the terms and conditions of the Partnership Agreement. This action,

Defendants claim, thus concerns a dispute that falls within the scope of the arbitration clause of the Partnership Agreement and, in accordance with its terms, demands arbitration of the matter in the Bahamas. Invoking the FAA, 9 U.S.C. § 3, Defendants request that DaPuzzo's action before this Court be stayed pending the outcome of arbitration proceedings pursuant to the Partnership Agreement. Section 3 provides in pertinent part that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

DaPuzzo counters that Chapter 1 of the FAA applies only to purely domestic arbi-

tration agreements and that, in the international context involved in the dispute at hand, it is not Chapter 1 of the statute that governs the parties' dispute, but the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 (the "Convention"), 21 U.S.T. 2517, 330 U.N.T.S. 38, June 10, 1958 (codified at Chapter 2 of the FAA, 9 U.S.C. § 201 *et seq.*).[3] DaPuzzo points out that, in accordance with the Convention's enabling act (the "Enabling Act"), codified in Chapter 2 of the statute, the Court lacks authority to compel arbitration in the Bahamas under Chapter 1 of the FAA because the parties' relationship at issue here is defined in an international agreement within the scope of the Convention and its Enabling Act, 9 U.S.C. § 202. Moreover, DaPuzzo maintains that because the Bahamas is not a signatory to the Convention,[4] the arbitration clause of the Partnership Agreement is unenforceable in this Court and cannot be applied to compel him to arbitrate in the Bahamas or to stay this action.

This case thus implicates the interplay between Chapters 1 and 2 of the FAA and the Convention,[5] enactments whose provi-

---

**3.** Article II of the Convention provides:

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The Court of a Contracting State, when seized of an action in a matter in respect to which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the

said agreement is null and void, inoperative or incapable of being performed.

9 U.S.C. § 201.

**4.** A list of the nations that are contracting parties to the Convention is included in 9 U.S.C. § 201 following the text of the Convention.

**5.** The Court notes that the relevant case law reflects some imprecision and overlapping nomenclature with respect to the exact title used to describe the various enactments and legal instruments embodying federal arbitration policy. The term "FAA" or the "Arbitration Act" is sometimes employed to encompass the entire body of federal law governing the subject of arbitration as now codified in Title 9 of the United States Code. That Title consists of three separate but interrelated Chapters. Chapter 1 comprises the original Federal Ar-

sions contain "overlapping coverage" and which may apply in a given case to the extent they do not conflict.[6] *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 934 (2d Cir.1983) ("There is no reason to assume that Congress did not intend to provide overlapping coverage between the Convention and the Federal Arbitration Act."); *see* 9 U.S.C. § 208 (prescribing that FAA Chapter 1 is incorporated into Chapter 2 to the extent not in conflict with the Convention); *see also Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 20 (2d Cir.1997), *cert. denied,* 522 U.S. 1111, 118 S.Ct. 1042, 140 L.Ed.2d 107 (1998); *Oil Basins Ltd. v. Broken Hill Proprietary Co. Ltd.*, 613 F.Supp. 483, 486 (S.D.N.Y.1985).

A brief contextual note may assist in understanding the relationship of the FAA Chapters 1 and 2 and the Convention insofar as they are germane to the resolution of the controversy at hand. As enacted in 1925, the Federal Arbitration Act (the "1925 Act"), codified in Title 9 as Chapter 1 and now comprising §§ 1–16, represented Congress's reversal of longstanding judicial antipathy, in both federal and state

---

bitration Act adopted in 1925 (the "1925 Act") and incorporates §§ 1–16 of Title 9. Chapter 2, which consists of §§ 201–208, contains the Enabling Act passed in 1970 to implement the Convention, as well as the text of the treaty itself and a list of signatories. Chapter 3, enacted in 1990 and comprised of §§ 301–307, gives effect to the Inter–American Convention on International Commercial Arbitration of 1975.

At times, references in the case law to the FAA define the entire contents of Title 9 globally. In other instances, however, citations to the "FAA" more narrowly refer only to the provisions of the 1925 Act codified Chapter 1 or to Chapters 1 and 2 combined. On occasion, references to the Convention and to the provisions of its Enabling Act codified in Chapter 2 conflate the two, or use terms interchangeably to describe either or both. Finally, some references to the FAA made in the context of discussion of Chapter 2 relate to the provisions of the Enabling Act, as well as to the relevant portions of Chapter 1 incorporated into Chapter 2 by virtue of 9 U.S.C. § 208.

In the interest of optimal clarity, as used in this case, the Court's citations to the "FAA" or the "Act" refer to the federal statute as a whole, in particular, to the contents of Chapters 1 and 2 taken together as manifesting the body of federal law and policy regarding arbitrability. Any specific references to the Convention convey solely the text of the treaty itself as set forth in 9 U.S.C. § 201. Where separate identification is necessary, the Enabling Act that implements the Convention and specifically comprises Chapter 2, 9 U.S.C. §§ 201–208, is referred to as the "Enabling Act" or "Chapter 2." And to distinguish between the provisions of the 1925 Act and those of the Convention's Enabling Act, the text will specify either Chapter 1 or Chapter 2 or both, as applicable.

**6.** The Court notes that this action was brought pursuant to the Court's diversity jurisdiction. If diversity exists, it would constitute a source for the Court's exercise of subject matter jurisdiction independent of the jurisdictional authority conferred by the Enabling Act. *See* 9 U.S.C. § 203 (providing that an action brought pursuant to the Convention shall be deemed to arise under the laws and treaties of the United States, thus vesting federal courts with original jurisdiction over such proceedings regardless of the amount in controversy). Here, Defendants challenge the existence of complete diversity between Da-Puzzo and other limited partners of the Fund who, according to Defendants, reside in Da-Puzzo's home state of Connecticut. DaPuzzo responds that his action is not derivative but based solely on the injury to him, and thus may properly proceed against the general partner even if the residence of limited partners destroyed complete diversity. Moreover, DaPuzzo stipulates that if upon review of relevant partnership documents the Court finds that strict diversity does not exist among all limited partners, he would dismiss his claims as against the Fund and proceed with the action only against the other Defendants. (*See* Plaintiff's Reply Memorandum of Law in Further Support of His Cross–Motion to Compel Arbitration in New York Before the American Arbitration Association, dated February 26, 2003, at n. 1.)

courts, to arbitration agreements. For centuries, such agreements had been perceived as executory contracts designed to oust courts of jurisdiction to adjudicate future disputes and consequently were held invalid or unenforceable. *See Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 510–11, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Kulukundis Shipping Co., S/A v. Amtorg Trading Corp.,* 126 F.2d 978, 984–85 (2d Cir.1942).

Emphatically rejecting that hostility, Congress, in § 2 of the 1925 Act, declared that a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Commerce" is defined in § 1 to embrace both interstate and foreign transactions. *See* 9 U.S.C. § 1. The 1925 Act thus gave rise to "a body of federal substantive law of arbitrability" applicable to any arbitration agreement within its scope. *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. 927; *Robert Lawrence Company v. Devonshire Fabrics, Inc.,* 271 F.2d 402, 409 (2d Cir.1959), *cert. granted,* 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, *dismissed under Rule 60,* 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); *see also U.S. Titan,* 241 F.3d at 146.

The legislation empowered federal courts to recognize and specifically enforce arbitration agreements within the reach of the statute. Among the court's primary means to serve these ends, the statute authorized staying litigation that contravenes the parties' contractual obligation to arbitrate, *see* 9 U.S.C. § 3; directing the parties to arbitrate covered disputes in accordance with the terms of their contract, *see* 9 U.S.C. § 4; and confirming awards rendered pursuant to valid arbitration, *see* 9 U.S.C. § 9.

■ The 1925 Act, however, embodied several anomalies and limitations. Though the statute established a distinct area of federal law fostering arbitration and enforcing the contractual commitment to do so, it did not create an independent source of federal jurisdiction for this purpose. *See Moses H. Cone,* 460 U.S. at 26 n. 34, 103 S.Ct. 927; *Robert Lawrence,* 271 F.2d at 408; *see generally* Donald P. Swisher, *International Commercial Arbitration Under the United Nations Convention and the Amended Federal Arbitration Statute,* 47 Wash. L.Rev. 441, 451 (1972). Hence, a litigant who seeks to invoke the statute to aid arbitration must satisfy the requirements of jurisdictional amount and diversity of citizenship, or demonstrate the existence of some other independent basis of subject matter jurisdiction, before the court may validly entertain an application for any remedy authorized by the statute. *See Moses H. Cone,* 460 U.S. at 26 n. 34, 103 S.Ct. 927. While federal courts may stay litigation instituted in violation of an arbitration clause, this relief is available only in the court in which the particular suit has been instituted. *See* 9 U.S.C. § 3; *Provident Bank v. Kabas,* 141 F.Supp.2d 310, 315 (E.D.N.Y. 2001); *Couleur Int'l., Ltd. v. Saint–Tropez West,* 547 F.Supp. 176, 177–78 (S.D.N.Y. 1982). Additionally, the statute confines the federal courts' authority to recognize arbitration agreements and confirm arbitral awards only when such proceedings are to occur, or the awards have been rendered, within the bounds of their own districts. *See* 9 U.S.C. § 4; *Snyder v. Smith,* 736 F.2d 409, 418 (7th Cir.1984), *overruled on other grounds, Felzen v. Andreas,* 134 F.3d 873, 877 (7th Cir.1998); *Provident Bank,* 141 F.Supp.2d at 315; *Couleur Int'l,* 547 F.Supp. at 177–78.

Prior to Congress's passage of the Enabling Act in 1970, these jurisdictional

and venue constraints worked to narrow even more markedly the scope of the federal courts' authority to recognize and enforce arbitration agreements covering international transactions, in particular those calling for arbitration to be held abroad or seeking enforcement of an arbitration agreement entered into, or confirmation of an arbitral award rendered, in a foreign state. *See generally* Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 70 Yale L.J. 1049, 1050, 1057 (1961). The federal courts' competence to recognize and give effect to such arbitration agreements and awards, absent individual bilateral treaties with particular nations, was often lacking. Where the authority existed, its efficacy depended on the substantive rules and procedures of the foreign states involved, the applicable practices of which varied from country to country. *See id.*

Nonetheless, federal jurisdiction over some actions brought to adjudicate controversies arising from international transactions covered by arbitration agreements existed under the 1925 Act, though limited in scope and hindered by the constraints described above. Absent some independent basis, federal courts lacked subject matter jurisdiction over cases involving foreign parties on both sides of the dispute. However, if original jurisdiction was properly invoked through the pleading of a federal question or the prerequisites of diversity, the Court, absent a bilateral treaty permitting otherwise, lacked authority, as circumscribed by 9 U.S.C. § 4, to direct arbitration abroad, or indeed beyond the bounds of the court's own district, even if the arbitration agreement's forum selection clause so specified. *See Batson Yarn and Fabrics Machinery Group, Inc. v. Saurer–Allma GmbH–Allgauer Maschinebau*, 311 F.Supp. 68, 70 (D.S.C.1970).

In such cases, litigation instituted with regard to issues subject to arbitration in a foreign state generally prompted either dismissal—if the only relief sought was arbitration and all of the issues in dispute were arbitrable—or more commonly, a stay of judicial proceedings pending foreign arbitration. *See id.* at 75 (construing the arbitration statute to mean that "[t]he power to grant a stay pending arbitration under Section 3 of the Act was not conditioned upon the existence of a power to compel arbitration under Section 4 and that, acting under Section 3, the court may properly 'order a stay even when it cannot compel the arbitration' and even though arbitration must take place beyond the jurisdiction of the court. And this is true, whether the arbitration is to be in the United States or in a foreign county." (quoting *Shanferoke Coal & Supply Co. v. Westchester Service Corp.*, 293 U.S. 449, 453, 55 S.Ct. 313, 79 L.Ed. 583 (1935))); *see also Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519–20, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974);[7] *Carcich v. Rederi. A/B Nordie*, 389 F.2d 692, 696 (2d Cir.1968); *Kulukundis*, 126 F.2d at 987–88; *Mannesmann*

---

7. *Scherk* involved a commercial dispute between a German citizen and an American corporation involving an agreement that called for arbitration in Paris, France. Although at the time in 1971 when the litigation commenced in federal court Congress had ratified the Convention and passed the Enabling Act, for reasons not articulated in the Supreme Court's opinion the case apparently proceeded under the provisions of Chapter 1 rather than Chapter 2. *See* 417 U.S. at 509–10, 94 S.Ct. 2449. In a footnote, the Supreme Court acknowledged the existence of the Convention and the Enabling Act, but nonetheless gave no indication that its decision rested on application of those enactments. *See id.* at 520 n. 15, 94 S.Ct. 2449.

*Rohrleitungsbau, G.M.B.H. v. S.S. Bernhard Howaldt,* 254 F.Supp. 278, 279 (S.D.N.Y.1965) ("The circumstance that the arbitration is to take place in a foreign country does not affect the right to a stay under 9 U.S.C. § 3."); *see generally* Swisher, *supra,* 47 Wash. L.Rev. at 462 (noting that "it has been generally held that section 4 has no application to arbitration in a foreign county," prompting courts to distinguish between motions under § 3 to stay proceedings and those under § 4 to compel arbitration).

By ratifying the Convention and legislating the accompanying Enabling Act, then codified as Chapter 2 of the FAA, 9 U.S.C. § 201–08, Congress intended to cure these limitations. The Convention itself, negotiated at a United Nations conference in New York in 1958, sought to remedy deficiencies that had impeded the effectiveness of two predecessor international agreements—the 1923 Geneva Protocol on Arbitration Clauses and the 1927 Geneva Convention on the Execution of Foreign Awards. *See Smith/Enron Cogeneration Ltd. Part., Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 93 (2d Cir.1999); *Bergesen,* 710 F.2d at 930–31; *see generally* Quigley, *supra,* 70 Yale L.J. at 1058; Albert Jan van den Berg, *The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation* 7–8 (1994). Specifically, the earlier treaties limited their applicability to arbitration agreements involving parties subject to the jurisdiction of different contracting states; to proceedings procedurally governed by local law; and to enforcement of arbitral awards made only in contracting states. The Convention addressed these flaws by authorizing the recognition and enforcement of qualifying arbitration agreements in courts of signatory states, without jurisdictional restrictions as to the citizenship of the parties to the contract or distinctions concerning the location of the matter in dispute. *See Smith/Enron,* 198 F.3d at 93–94; *Bergesen,* 710 F.2d at 931, 933; Quigley, *supra* 70 Yale L.J. at 1060–61.

In § 202, the Enabling Act describes the types of arbitration agreements and awards enforceable by federal courts under the Convention. It provides:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

9 U.S.C. § 202; *Toys "R" Us,* 126 F.3d at 20; *Smith/Enron,* 198 F.3d at 92.

The Convention has been uniformly applied to actions between foreign entities and United States parties concerning disputes that, as in the instant case, principally involve conduct and performance abroad with respect to contracts entered into in the United States. *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,* 241 F.3d 135, 146 (2d Cir.2001); *Chelsea Square,* 189 F.3d at 294; *Toys "R" Us,* 126 F.3d at 19; *see also Scherk,* 417 U.S. at 508, 511 n. 5, 94 S.Ct. 2449 (agreement between American Company and German citizen negotiated in the United States and Europe which called for transfer of certain interests to the American corporation). In *Toys "R" Us,* the Second Circuit, interpreting § 202, concurred with the Seventh Circuit in declaring the provision to mean that " 'any commercial arbitral agreement,

unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls under the Convention.'" 126 F.3d at 19 (quoting *Jain v. de Mere*, 51 F.3d 686, 689 (7th Cir.), *cert. denied*, 516 U.S. 914, 116 S.Ct. 300, 133 L.Ed.2d 206 (1995)).

▮ However, not every arbitration agreement that satisfies this definition is necessarily enforceable under the Convention and the Enabling Act.[8] In *U.S. Titan*, the Second Circuit further elaborated the standards by which "an agreement to arbitrate exists within the meaning of the [Convention] *and* the [FAA]," requiring four preliminary findings: "(1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope." 241 F.3d at 146 (citing 9 U.S.C. § 201 and *Smith/Enron*, 198 F.3d at 92) (emphasis added). If an agreement to arbitrate satisfies these criteria, a court petitioned to recognize the contract must enforce its arbitration terms. *See id.* ("Arbitration agreements subject to the Convention are enforced in accordance with Chapter 2 of the FAA.... [U]pon

finding that such an agreement exists, a federal court must compel arbitration of any dispute falling within the scope of the agreement pursuant to the terms of the agreement."); *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 187 (1st Cir.1982) (noting that if the district court resolves in the affirmative the four preliminary findings, then it must order arbitration unless it finds the agreement null and void, inoperative or incapable of performance); *see also Chelsea Square*, 189 F.3d at 294.

Enforcement of an arbitration agreement requires a court properly "seized of an action," at the request of a party to the agreement, to issue an order directing the parties to honor their contractual obligation and proceed to arbitrate the matter in dispute. Convention, Article II(3), 9 U.S.C. § 201; *Jain*, 51 F.3d at 691. Although the Convention contains no express provision concerning a stay of the underlying litigation, such authority exists both implicitly, as well as by incorporation of Chapter 1 into Chapter 2 and the Convention through 9 U.S.C. § 208. *See Andros Compania Maritima, S.A. v. Andre & Cie, S.A.*, 430 F.Supp. 88, 92 (S.D.N.Y.1977); *see generally* Quigley, *supra*, 70 Yale. L.J. at 1064; *van den Berg*, at 130.[9]

---

8. The scope of the Enabling Act is not entirely coextensive with the permissible coverage of the Convention. For instance, the Convention contains no explicit limitation to commercial disputes, but allows each contracting state to define in its national law the nondomestic matters to which the Convention would apply. *See* Convention, Art. I(3), 9 U.S.C. § 201; Quigley, *supra* 70 Yale L.J. at 1061. The Convention also permits reservations enabling signatories, on the basis of reciprocity, to confine recognition and enforcement of awards made in other contracting states. *See* Convention, Art. I(3); Quigley, *supra*, at 1061. The effect of these reservations, adopted by the United States when it acceded to the Convention, is to preclude application of the Convention and the Enabling Act to recognition of agreements pro-

viding for arbitration in a non-contracting state or to enforcement of awards made in such countries. *See* Swisher, *supra*, 47 Wash. L.Rev. at 457.

9. Such competence would exist implicitly, in particular, because not all issues presented in disputes subject to the Convention are necessarily arbitrable; some matters may fall within the terms of the arbitration agreement while others may not. *See Dean Witter*, 470 U.S. at 219, 105 S.Ct. 1238 ("The Act, after all, does not mandate the arbitration of all claims, but merely the enforcement—upon the motion of one of the parties—of privately negotiated arbitration agreements.") The court in which the underlying action is pending, assuming it otherwise has jurisdiction over the matter and the parties, may thus stay

The court's authority to compel arbitration of a dispute covered by an agreement subject to the Convention is set forth in Chapter 2 under § 206, which states in pertinent part that: "A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206.

■ However, as discussed above, arbitration of a dispute involving an international commercial transaction may not be compelled under an agreement calling for arbitration to occur in a country that is not a contracting party to the Convention. *See National Iranian Oil Co. v. Ashland Oil, Inc.,* 817 F.2d 326, 331 (5th Cir.), *cert. denied,* 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987) (noting that under the Convention federal courts were granted power to compel arbitration only in signatory countries). The Second Circuit has recognized such a prerequisite in its articulation of the four standards that determine whether an arbitration agreement enforceable under the Convention and the FAA exists. *See U.S. Titan,* 241 F.3d at 146; *Smith/Enron,* 198 F.3d at 92; *see also Jain,* 51 F.3d at 691 (noting language in a number of cases "suggesting that specifying a location for arbitration in a state that has adopted the Convention is a prerequisite for compelling arbitration

pursuant to chapter 2." (citing *Sedco,* 767 F.2d at 1145, and *Ledee,* 684 F.2d at 186)).

■ In sum, an arbitration agreement relating to an international transaction that falls within the definition of § 202, but that designates a non-signatory state as the forum for arbitration, does not qualify as an "agreement within the meaning of [the Convention]" and the Enabling Act, and is thus not enforceable in federal courts in accordance with its terms. Convention, Article II(3), 9 U.S.C. §§ 201, 206. On this basis, the Court concludes that the arbitration provision in the Partnership Agreement is not entitled to recognition and enforcement by this Court because the forum selection clause in that contract renders the agreement as one falling outside the ambit of the Convention and the Enabling Act, and thus not qualifying to support an exercise of the Court's jurisdiction to compel arbitration in the Bahamas, a non-signatory state. Nonetheless, as elaborated below, under some circumstances such agreements may fall within the reach of the 1925 Act in other respects and for other purposes.

■ The Second Circuit, endorsing the four-part test enunciated by the *Ledee* court, observed that the scope of inquiry performed by a district court "in considering a petition to compel arbitration under Chapter Two of the FAA is 'very limited.'"

---

the litigation solely with respect to the arbitrable aspects of the dispute. In fact, Article II(1) of the Convention clearly recognizes that an arbitration agreement may provide for arbitration of "all or any differences" which arise between the parties. 9 U.S.C. § 201; *see generally* Quigley, *supra* 70 Yale L.J. at 1064.

Otherwise, the power to stay an action related to an arbitration agreement encompassed by the Convention could derive from incorporation of § 3 into Chapter 2 and the Convention to the extent application of § 3's provisions in a given case is not incompatible

with the requirements of the Convention. *See* 9 U.S.C. § 208; *Sedco Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.,* 767 F.2d 1140, 1146 (5th Cir.1985) (noting that by reason of the incorporation of Chapter 1 into the Convention pursuant to 9 U.S.C. § 208, both the FAA and the Convention provide that a district court may stay an action upon finding that a dispute in the pending lawsuit is subject to arbitration); *see generally* John P. McMahon, *Implementation of the UN Convention on Foreign Arbitral Awards in the U.S.,* 2 J. Mar. L. & Com. 735, 754 (1971).

*Smith/Enron,* 198 F.3d at 92 (quoting *Ledee,* 684 F.2d at 186). Thus, were jurisdiction over the instant litigation grounded solely on the Convention and Chapter 2, the Court's inquiry here would necessarily end at this point. *See, e.g., id.* at 92, 92 n. 3 (noting that, because diversity was lacking in that case, the only basis for exercise of federal jurisdiction, if it existed, was Chapter 2.) Here, however, DaPuzzo instituted the underlying action under the Court's diversity jurisdiction, and DaPuzzo also has invoked that authority in his cross-motion for an order to compel arbitration in New York. In this connection, it bears highlighting that the Convention and the Enabling Act do not encompass the entire field of arbitration agreements involving international commercial transactions, and that where an arbitration clause designates a forum in a country that is a non-contracting party to the Convention, the Court may still possess jurisdiction to grant appropriate relief solely under the provisions of Chapter 1. *See generally* Swisher, *supra,* 47 Wash. L.Rev. at 474 n. 134 ("[T]he 1970 [Enabling] Act does not extend to arbitration in countries not parties to the Convention. As to these situations, the limitations of section 4 of the 1925 Act remain fully applicable."). Consequently, though the arbitration agreement at issue here does not fall within the scope of enforcement authorized under Chapter 2, the Court may still consider whether a sufficient basis exists to provide any available remedy to Defendants pursuant to Chapter 1, insofar as the Court's exercise of jurisdiction to do so would not conflict with any provision of the Convention or Chapter 2.

■ Having examined the matter from this perspective, the Court concludes that it lacks the authority to compel arbitration in the Bahamas even under the provisions of Chapter 1 that Defendants invoke.

First, an order of this Court directing arbitration in the Bahamas would contravene congressional policy explicitly conferring federal jurisdiction to compel arbitration in foreign states only in connection with arbitration agreements encompassed by the Convention and the Enabling Act. *See* 9 U.S.C. § 206; *National Iranian Oil,* 817 F.2d at 331, 335. Moreover, such an order would be barred by the plain language of § 4. That provision states that a party to an arbitration agreement allegedly breached by another party may bring an action in a federal court having jurisdiction over the matter:

> for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.

9 U.S.C. § 4.

Thus, § 4 embodies a mandate that in some cases may engender an internal conflict: it directs both that the court enforce an arbitration agreement in accordance with its terms and that it may direct arbitration only if it is to occur within the court's own district. *See Jain,* 51 F.3d at 690; *National Iranian Oil,* 817 F.2d at 330; *Snyder,* 736 F.2d at 419–20; *Oil Basins,* 613 F.Supp. at 487. Consequently, in reviewing a petition to enforce an agreement within the scope of Chapter 1, "[a] district court compelling arbitration under § 4 lacks the power to order arbitration to proceed outside its district." *Jain,* 51

F.3d at 690;[10] *see also Provident Bank v. Kabas,* 141 F.Supp.2d 310, 319 (E.D.N.Y. 2001); *Oil Basins,* 613 F.Supp. at 487. Accordingly, this Court lacks authority under § 4 to direct the parties to arbitrate their dispute in the Bahamas.

In reply, Defendants apparently concede that their agreement to arbitrate in the Bahamas is unenforceable in federal court and request instead that, if the Court so concurs, it stay proceedings in this matter, pursuant to 9 U.S.C. § 3, pending arbitration in the Bahamas. Before addressing whether a sufficient basis for such a remedy exists under the circumstance presented by this case, the Court will first consider DaPuzzo's cross motion.

## C. *THE CROSS–MOTION*

DaPuzzo argues in his cross-motion that because the Court lacks jurisdiction to compel arbitration in the Bahamas, it should enforce the parties' agreement to arbitrate in New York in accordance with the relevant language contained in the CIM, which he contends is incorporated by reference into the Subscription Agreement and the Partnership Agreement.

DaPuzzo asserts that the CIM arbitration provision referring to the AAA stands alone as another arbitration clause that could be read separately and given effect in resolving the dispute at hand even if the Bahamas clause is unenforceable. Seeking a substantive distinction between the two provisions, he posits that the CIM's AAA arbitration language is broader, encompassing any dispute relating to the Partnership, while the Bahamas provision applies more narrowly only to controversies specifically involving the terms of the Partnership Agreement. Accordingly, DaPuzzo contends that the text of the Bahamas clause cannot apply to the adjudication of a dispute arising from representations made outside the Partnership Agreement to induce his investment, which is the matter at issue in this action and one that he maintains would be covered instead by the CIM's provision.

Finally, DaPuzzo points out that Defendants drafted all the documents pertaining to the parties' relationship and transactions, and that he was not actually provided with a copy of the Partnership Agreement until three years after he signed the Subscription Agreement. Consequently, he asserts that if an ambiguity here exists as to the content of the parties' agreement, it should be construed against the interest of the party that prepared the relevant papers. *See Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62–63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *PaineWebber,* 81 F.3d at 1199; *see also Int'l Multifoods Corp. v. Commercial Union Ins., Co.,* 309 F.3d 76, 88 n. 7 (2d Cir.2002). The Court finds no merit in these arguments. It does not follow that because this Court cannot direct enforcement of the Partnership Agreement's arbitration clause in the Bahamas, that a suffi-

---

**10.** In some cases to which the Convention and Chapter 2 do apply, a potential conflict may arise between the provisions of Chapter 1 and those of Chapter 2. In endeavoring to harmonize the overlap between § 4 of Chapter 1 and § 206 of Chapter 2, the Seventh Circuit explained:

Without question, chapter 2 incorporates § 4 to some degree. Where an arbitration agreement specifies an arbitration site, § 4 is admittedly incompatible with chapter 2. If the agreement calls for arbitration within the district in which the action is brought, both § 4 and § 206 permit the court to compel arbitration there; section 4 is at most redundant. If the agreement calls for arbitration outside of the district in which the action is brought, the limits of § 4 directly conflict with the district court's powers under § 206, and § 208 would render § 4 inapplicable.

*Id.*

cient basis exists under the CIM for it to compel arbitration in New York.

 In accordance with cardinal doctrines of contract interpretation, courts must endeavor to read a contractual document in a manner that gives effect to all of its provisions and that causes them to be consistent with one another. *See Mastrobuono*, 514 U.S. at 63, 115 S.Ct. 1212. Equally settled is the doctrine that construing contractual language in a manner that renders contract provisions superfluous is disfavored. *See Int'l Multifoods*, 309 F.3d at 86. Nonetheless, these rules are not absolute. They are premised on the existence of a choice among reasonable meanings of contract provisions, and presuppose also that other relevant considerations are not dispositive. *See* 2 Restatement (Second) of Contracts § 203(a) (1979) ("[A]n interpretation which gives a reasonable ... and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable ...."); *see also id.* § 206 cmt. a (noting that the doctrine applies in cases of doubt "so long as other factors are not decisive")

 Moreover, the Second Circuit has noted that New York law has become increasingly reluctant, except " 'as a matter of last resort' ", to apply the rule construing ambiguous contract terms against the drafter and that the doctrine is "generally inappropriate if both parties are sophisticated." *Int'l Multifoods*, 309 F.3d at 88 n. 7 (quoting *United States Fire Ins. Co. v. General Reins. Corp.*, 949 F.2d 569, 573 (2d Cir.1991)). Rather, the central inquiry under New York law as to whether an ambiguity exists in a contract is whether the terms "could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology

as generally understood in the particular trade or business.' " *Morgan Stanley Group Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir.2000) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997)). Finally, in construing contractual language, it bears recalling the Second Circuit's admonition that " 'rules of interpretation[ ] must be taken as a guide, not a dictator. The text should always be read in its context. Indeed, text and context necessarily merge to some extent....' " *Int'l Multifoods*, 309 F.3d at 87 n. 4 (quoting *United States v. Lennox Metal Mfg. Co.*, 225 F.2d 302, 311 (2d Cir.1955)).

 DaPuzzo asserts that the parties' agreements contained not one but two arbitration clauses and that the two "can easily be read to give effect to both provisions, without doing violence to either." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration in the Bahamas or to Dismiss the Complaint and in Support of Plaintiff's Cross–Motion to Compel Arbitration in New York, dated January 30, 2003, at 15.) In essence, this contention suggests that the CIM arbitration provision constitutes a free-standing, unambiguous and enforceable contractual obligation separate and apart from the clause in the Partnership Agreement addressing the same subject. The Court finds this proposition untenable and objectively unreasonable when the parties' relationship and documents in question are examined in full context.

First, viewed against the backdrop of the parties' entire transaction, the CIM does not constitute an independent contractual document expressing rights and duties separate and apart from those articulated in the Subscription Agreement and Partnership Agreement. If the latter two documents did not exist at all, DaPuzzo might have a colorable argument. But

DaPuzzo cannot reasonably maintain that, objectively, the CIM and the Partnership Agreement were actually intended to stand side by side separately committing the parties to conflicting arbitration obligations.

By its terms, the CIM is a summary of general material and underlying documents relating to investment in the Fund that was "prepared solely for the information of the investor to whom it has been delivered...." (Notion of Motion Ex. 1, at ii.) [11] It warns that "a number of factors material to a decision whether to invest in the partnership have been presented in this memorandum *in summary or outline form only* in reliance on the financial sophistication of all offerees." (*Id.* (emphasis added).) Indeed, the very first paragraph of the document warns that:

> This document shall not constitute an offer to sell or a solicitation of an offer to buy any interests.... The information contained herein is subject to updating and amendment.

(*Id.* at Cover Page.)

The AAA arbitration provision DaPuzzo relies upon is set forth in the section of the CIM entitled, both in the Table of Contents as well as on the corresponding page of the text, "Summary of the Partnership Agreement." (Notice of Motion, Ex. 1, at iv and 41.) That section begins with an introductory paragraph stating that:

> *The rights and obligations of Partners will be governed by the Partnership Agreement.* The following briefly *summarizes* certain provisions of the Partnership Agreement.... Prospective investors are urged to read the Part-

nership Agreement in its entirety before subscribing.

(*Id.* at 41 (emphasis added).)

It is thus clear that the arbitration clause contained in the CIM was designed to be merely a summary of the corresponding provision of the Partnership Agreement, not a free-standing representation imbued with its own contractual rights and obligations. That the summary inaccurately describes a particular term does not, without more, constitute it as an entirely independent contractual obligation.

In response, DaPuzzo cites a statement, conveyed in the transmittal letter sent to him on March 22, 2001, enclosing an original copy of the Partnership Agreement for execution and for his records, in which Globalvest asserts that the Partnership Agreement "further outlines the terms of the Partnership in conjunction with the [CIM]." (Letter from Una C. Dyer to Peter J. DaPuzzo of 3/22/01, attached as Exhibit 4 to the Notice of Motion.) But even if the two documents were to be read in conjunction with each other, it does not follow, as DaPuzzo maintains, that language in the CIM contradicting the corresponding provision of the Partnership Agreement can be readily reconciled or that the conflicting provision identified as a summary of the operative document would necessarily control the Partnership Agreement.

In analogous situations, New York courts have rejected attempts to incorporate provisions of collateral understandings or documents into the underlying agreement that gives rise to the parties' relationship or the transaction at issue, when such understandings conflict with the

---

**11.** The CIM contains two page "ii"s. For the sake of clarity, the Court will hereinafter refer to the first page ii as the "Cover Page."

underlying written agreement. *See, e.g., Marine Midland Bank–Southern v. Thurlow,* 53 N.Y.2d 381, 442 N.Y.S.2d 417, 425 N.E.2d 805, 807–808 (1981) (evidence of all prior or contemporaneous negotiations between the parties offered to contradict or modify the terms of the writing excluded); *Thomas v. Scutt,* 127 N.Y. 133, 27 N.E. 961, 963 (1891) (when a written instrument is potentially not the entire agreement between the parties, evidence of additional understandings "must be consistent with and not contradictory of" the underlying agreement); *see also Wallace Steel, Inc. v. Ingersoll–Rand Co.,* 739 F.2d 112, 115 (2d Cir.1984); *Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 451–53 (2d Cir. 1977).

The Second Circuit has allowed provisions *from* underlying agreements to be incorporated *into* collateral agreements when doing so does not create internal inconsistency. In *Threlkeld,* for example, the parties' contract made reference to their agreement to arbitrate disputes in accordance with the rules of the London Metal Exchange ("LME"), which contained two provisions dealing with arbitration. *See* 923 F.2d at 249. Plaintiff argued that the claims it asserted in the litigation arose from a collateral agreement with defendant that contained no arbitration clause, and not from the underlying metal forward contracts at issue, which contained the LME arbitration provisions. Rejecting plaintiff's arguments that the metals contracts and the alleged collateral agreement were separate and distinct agreements, the Circuit Court noted that the forward contracts "were the genesis of the parties' relationship [and] the alleged collateral agreement stemmed directly from the forward contracts"; that the two documents covered the same subject and were integrally related; and that the two LME clauses were not individual, free-standing clauses, but closely interconnected provi-

sions. *Id.* ("[Plaintiff] would have us read each of these provisions in a vacuum. This we cannot do."). The Court therefore interpreted the LME provisions to extend to the collateral agreement.

Similarly, in *Pervel Indus., Inc. v. TM Wallcovering, Inc.,* 871 F.2d 7 (2d Cir. 1989), the parties had transacted numerous standard purchase orders related to plaintiff's products. Each of those contacts contained an arbitration clause. Under a related arrangement, defendant granted plaintiff an exclusive distributorship license. A dispute arose and defendant brought a state court action under the distributorship agreement. Defendant demanded arbitration pursuant to the purchase order agreements and moved in federal court, to which the case had been removed, to enforce the arbitration provision. Affirming an order compelling arbitration, the Second Circuit found that the distributorship was not a separate contract, but rather one that directly related to, and arose from, the purchase and sale agreement. *Id.* at 8–9.

In the instant case, the parties' legal relationship arose from, and is primarily defined by, the Subscription Agreement and the Partnership Agreement. At best, the CIM, like the alleged collateral agreements in *Threlkeld* and *Pervel,* is an adjunct document bearing some relationship to the Partnership Agreement, but necessarily subordinate to, and dependent upon, the Partnership Agreement, without which the CIM has "no starting point, no finishing point and no subject matter." *Pervel,* 871 F.2d at 9. Therefore, the CIM cannot properly be understood as having been incorporated into the parties' arrangement reflected in the Subscription Agreement and the Partnership Agreement, with which it conflicts.

The Court rejects DaPuzzo's argument that the two arbitration provisions here may be easily accommodated. In fact, the CIM arbitration language is palpably at odds with the parallel provision of the Partnership Agreement. The CIM clause makes reference to settlement of disputes by binding arbitration according to the rules and regulations of the AAA. (*See* Notice of Motion Ex. 1, at 43.) Moreover, the provision does not designate a forum. By contrast, the Partnership Agreement specifies the Bahamas as the venue and the applicable arbitration rules to be those of the ICC, and disclaims waiver of the right to proceed in a judicial forum insofar as any such waiver would be unlawful. (*See id.* Ex. 3 ¶ 13.12, at 31.)

Contrary to DaPuzzo's theory, this contradiction cannot be readily reconciled by holding the CIM clause to encompass a broader range of disputes relating to the partnership, while considering the Bahamas provision to be more narrowly confined to disputes regarding the terms of the Partnership Agreement. However finely DaPuzzo endeavors to parse the two provisions and align the basis for his lawsuit with one interpretation, the Court is not persuaded that DaPuzzo's allegations of fraud in the inducement as pleaded in his complaint could reasonably be read as a controversy not "involving the construction or application of any of the terms, covenants, or conditions" embodied in the Partnership Agreement. (*Id.*)

The Partnership Agreement's arbitration clause encompasses *any* such controversy, and is otherwise formulated in broad terms expansive enough to reach the dispute at hand. *See AT & T Technologies*, 475 U.S. at 650, 106 S.Ct. 1415 (noting that the presumption of arbitrability of specific issues is particularly applicable where the arbitration clause is broadly worded to embrace "any differences");

*WorldCrisa*, 129 F.3d at 75; *Threlkeld*, 923 F.2d at 251. The very essence of DaPuzzo's theory is founded on the meaning of "Term of the Partnership," "Drawdowns," "Commitment Period," and "Dissolution," as those terms are defined in ¶¶ 2.6, 3.2 and 12 of the Partnership Agreement. (Notice of Motion, Ex. 3.) These allegations integrally " 'touch matters' " squarely covered by the terms of the Partnership Agreement. *See Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir.1987) (quoting *Mitsubishi*, 473 U.S. at 624 n. 13, 105 S.Ct. 3346). In sum, the situation at hand is not one where distinct provisions of separate documents addressing different procedures that could be read and harmoniously accommodated under the framework of the governing contract are incorporated into one integrated agreement. *See PaineWebber*, 81 F.3d at 1201 ("[T]he Agreement cannot be deemed to incorporate *all* these limitations rules by reference, because there is no basis for assuming that they are consistent....").

Here, as in *PaineWebber*, the Court finds that the parties, viewing the circumstances objectively as reasonably intelligent, sophisticated persons, could not reasonably have formed an intent to incorporate into their agreement two clearly contradictory arbitration provisions that would apply to essentially the same scope of disputes. *See id.; see also Int'l Multifoods*, 309 F.3d at 83. Both provisions cover the same subjects: arbitration of disputes arising from, or relating to, the parties' relationship as defined in the partnership documents, and the applicable law governing the partnership to be that of the Cayman Islands. As a summary document, the CIM on its face could not have been designed to encapsulate every aspect of the parties' relationship and every right and obligation embodied in the Partnership Agreement. Hence, the omission in the CIM of any

reference to a particular arbitration venue and to the waiver provision reflected in the Partnership Agreement is explainable.

Similarly, the CIM's summary content cannot serve as a substitute for an entirely separate and distinct commitment in relation to the more detailed, unambiguous language of the underlying documents that the parties actually executed and accepted as a manifestation of their full agreement. In fact, the Partnership Agreement explicitly states that "[t]his Agreement and the Subscription Agreements executed and delivered by Limited Partners in connection with their initial Capital Contributions, together constitute the complete agreement among the parties concerning the subject matter hereof." (Notice of Motion, Ex. 3 ¶ 13.9, at 30.) This general merger clause, as applied to any "subject matter hereof," including the arbitration agreement, effectively subsumes and supplants the inconsistent language of any prior or contemporary collateral understanding covering the same subject. *Id.; see Threlkeld*, 923 F.2d at 251–252.

Though DaPuzzo asserts that an actual copy of the Partnership Agreement was not provided to him for personal execution until three years after his subscription to a limited partnership interest in the Fund, nowhere does he challenge the validity of that contract or its arbitration clause, nor does he deny his explicit consent to it. Even if he did not actually receive and execute the Partnership Agreement until that later date, at the time DaPuzzo became legally committed to his investment in the Fund by signing the Subscription Agreement, he acknowledged having received and read the Partnership Agreement, and agreed to be bound "to each and every term of the Partnership Agreement as if my signature were subscribed thereto." (Notice of Motion, Ex. 2, ¶ 3(c), at 4.)

*See Genesco*, 815 F.2d at 845 ("Under general contract principles a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such an obligation."); *Level Export Corp. v. Wolz, Aiken & Co.*, 305 N.Y. 82, 111 N.E.2d 218, 221 (1953) (holding that a party cannot avoid arbitration of a dispute encompassed by a valid arbitration clause contained in a binding contract by claiming that he was unaware of or never read the arbitration provision); *see also Berger v. Cantor Fitzgerald Sec.*, 967 F.Supp. 91, 93 (S.D.N.Y. 1997) ("Under New York law, a person who signs a contract is presumed to know its contents and to assent to them." (quoting *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 45 (2d Cir.1993))). In any event, DaPuzzo would be bound by the contractual obligation to arbitrate even if he had not executed the Partnership Agreement. *See Genesco*, 815 F.2d at 846 ("[A] party may be bound by an agreement to arbitrate even absent a signature.... [W]hile the Act requires a writing, it does not require that the writing be signed by the parties." (citations omitted; internal citations omitted)).

Here, DaPuzzo cannot escape the legal consequences of his obligation to fully review the entire contractual document governing his investment before committing to its contents, *see id.* at 95, and the Court finds no special circumstances sufficient to relieve DaPuzzo of his duty to abide by the binding promises made under the contract that he executed.

One of the terms of the Subscription Agreement provides that the subscriber appoints the president and director of the Fund's general partner as lawful attorney-in-fact to execute the Partnership Agreement on his behalf. (*See* Notice of Motion, Ex. 2 ¶ 6, at 4.) By committing to be bound

by the terms and conditions of the Partnership Agreement at the time he executed the Subscription Agreement, DaPuzzo accepted the arbitration clause provision designating the Bahamas and the rules of the ICC as the venue and applicable process, respectively, for arbitration of any dispute arising under the Partnership Agreement. In this regard, it bears taking into account that DaPuzzo, a co-president of institutional equity investments at a substantial New York brokerage firm, is presumably a sophisticated investor. *See Threlkeld,* 923 F.2d at 249 (noting as consideration in rejecting a challenge to the arbitration provision that plaintiff was "a sophisticated commodities trader with extensive experience in the field"). Aside from DaPuzzo's apparently high-ranking professional position, the significant level of his investment in the Fund, and his being represented in connection with the transaction at issue by an institutional investment adviser, further support a fair inference that DaPuzzo had more than a passing acquaintance with complex financial investments and the contents of attendant documents, specifically, the scope of arbitration provisions.

But even if the two arbitration provisions stood as separate documents, DaPuzzo concedes that he received the CIM when he signed the Subscription Agreement in 1998 and does not dispute that he formally and personally consented to the Partnership Agreement by executing it in 2001. In this respect, insofar as the CIM may have reflected DaPuzzo's understanding of a distinct arbitration provision—a dubious proposition since he acknowledged having contemporaneously received and read the Partnership Agreement—he must have been on notice of the inconsistent clause in the Partnership Agreement when he later endorsed it, and must then have reaffirmed or ratified the second version of the clause as binding.

Moreover, DaPuzzo does not allege that he called the contradiction to Defendants' attention or that he challenged any conflicting language between the CIM and the Partnership Agreement when he executed the latter in 2001. If he became aware in June 2001 of an ambiguity or contradiction in the arbitration provisions of the Partnership Agreement and chose not to disclose the conflict, it would be inequitable to allow him now to invoke and rely upon it as grounds to challenge the provision reflected in the document he accepted and executed. To permit such invocation under these circumstances would offend the principles embodied in the well-settled doctrine of equitable estoppel. *See, e.g., Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301 (2d Cir.1996) ("Equitable estoppel is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought."); *see also Ionosphere Clubs, Inc. v. Ins. Co. of PA (In re Ionosphere Clubs, Inc.),* 85 F.3d 992, 999 (2d Cir.1996); *Nassau Trust v. Montrose Concrete Prod. Corp.,* 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d 1265, 1269–70 (1982).

The Court thus concludes that the Partnership Agreement's arbitration clause constitutes the controlling provision concerning the dispute at hand and reflects the terms by which the parties agreed to be bound. *See M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 15–19, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (instructing that courts should give effect to the parties' forum-selection clauses in freely-negotiated arbitration agreements); *see also Snyder,* 736 F.2d at 419. Accordingly, the

Court denies DaPuzzo's motion for an order compelling arbitration in New York.

### D. *STAY OF JUDICIAL PROCEEDINGS*

Having determined that under an application of either Chapter 1 or Chapter 2 of the FAA the Court is precluded from compelling arbitration in the Bahamas, and that the terms of the controlling agreement here cannot reasonably be read to support a contractual commitment by the parties to arbitrate disputes in New York, the Court turns to consideration of an appropriate remedy to address these circumstances. Defendants assert that, should the Court decline to compel arbitration in the Bahamas, it should stay this action either pursuant to Chapter 1, 9 U.S.C. § 3, or in the exercise of the Court's inherent discretion to control its docket.

DaPuzzo counters that under the Convention and Chapter 2 this Court not only cannot compel arbitration of this dispute in the Bahamas, but that there is also no authority under these provisions for the Court to stay the instant litigation pursuant to § 3 of Chapter 1. According to DaPuzzo, a federal court may issue a stay pursuant to § 3 only where the issue involved in the underlying litigation is referable to arbitration. In other words, under this theory, a stay of proceedings in a lawsuit is appropriate only where arbitration could be compelled by the federal court in which the litigation is pending, even if, in accordance with its terms, arbitration could be enforced by a court situated in another contemplated forum. Furthermore, DaPuzzo asserts that because this Court cannot, consistent with § 202 of Chapter 2, compel arbitration in the Bahamas—a non-signatory to the Convention—the dispute at bar does not qualify as one "referable to arbitration" and therefore is not subject to the stay authority conferred by § 3.

The Court has found no controlling authority, and the parties have supplied none, squarely addressing the question as to whether § 3 provides a basis for a court to stay litigation in a case where it cannot compel arbitration under an application of either Chapter 1 or Chapter 2 of the FAA and where the forum designated in the parties' arbitration agreement is that of a non-signatory to the Convention. As context for its response to Defendants' request for a stay as the issue arises in the instant case, the Court notes an inherent tension between some of the aims of the Convention and those reflected by the policy embodied in the FAA as a whole. One of the central purposes of the Convention is to promote stability, economy and efficiency in international commerce through more expeditious resolution of contractual disputes and greater uniformity in the standards governing the recognition and enforcement of foreign arbitral awards involving international transactions. *See Scherk*, 417 U.S. at 520 n. 15, 94 S.Ct. 2449; *Threlkeld*, 923 F.2d at 248. To maximize those ends, Congress, in adopting the Enabling Act, enlarged the range of actions that could be brought in federal courts to enforce qualifying arbitration agreements. It did so specifically by vesting federal courts with original jurisdiction over proceedings commenced under the Convention, regardless of the foreign citizenship of the parties and the amount in controversy, and by authorizing federal courts to compel arbitration in any district, even extraterritorially in other signatory nations. *See* 9 U.S.C. §§ 203, 206; *Jain*, 51 F.3d at 689.

At the same time, however, as discussed above, as authorized by Congress in implementing the Convention, courts lack jurisdiction to compel arbitration agreements in

non-signatory countries. *See National Iranian Oil,* 817 F.2d at 331. Moreover, pursuant to the optional protocol contained in Article I(3) of the Convention,[12] which the United States adopted when it ratified the treaty,[13] the Convention may be applied on the basis of reciprocity to the recognition and enforcement of only those awards made in contracting states. *See id.* at 335. These limitations, as the Fifth Circuit noted in *National Iranian Oil,* may have been meant

> only to allow signatories to partake of the Convention's benefits in U.S. courts and thus to give further incentives to non-signatory nations to adhere to the Convention.... Were we to order arbitration in the U.S. in the face of a forum selection clause designating a non-signatory forum, which was unenforceable *ab initio,* the non-signatory would have little reason to leave the Hobbesian jungle of international chaos for the ordered and more predictable world of international commercial law.

817 F.2d at 335.

Whatever the intent of these policies, insofar as parties to a contract designate arbitration to occur or seek enforcement of arbitral awards rendered in any of the Convention's non-signatory states,[14] the limitations described above may serve to some degree to circumscribe the universe of arbitration agreements to which federal courts could recognize and give effect. This consequence would work against the FAA's mandate to courts to treat agreements to arbitrate "with a healthy regard for the federal policy favoring arbitration", and to honor the legitimate expectations and commitments manifested by parties to an arbitration clause in accordance with the express terms of their contract. *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. 927; *see also M/S Bremen,* 407 U.S. at 12, 92 S.Ct. 1907 ("The choice of [arbitration] forum was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts."); *Scherk,* 417 U.S. at 519–20, 94 S.Ct. 2449.

Of course, Congress has the prerogative to legislate such national policy choices, and to resolve conflicts between statutory ends in favor of the narrower scope of its enactments. Where Congress pronounces itself plainly and clearly concerning such policy options in a matter within its power, courts are duty-bound to enforce that mandate. Here, in the Court's reading of Congress's intent reflected in the United States's acceding to the Convention and legislating the Enabling Act, it is by no means apparent that Congress contemplated narrowing the scope of arbitration agreements that courts could acknowledge, if not enforce, under the FAA, to the extent doing so would not conflict with the Convention. *See Smith/Enron,* 198 F.3d at 94 (noting that it is "questionable" whether the reciprocity provision found in Article I(3) of the Convention, dealing with

---

**12.** Article I(3) of the Convention provides in relevant part:

> When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State.

9 U.S.C. § 201.

**13.** *Id.* at n. 29

**14.** As of May 27, 1999, 147 countries have ratified the Convention. *See* T.M.C. Asser Institute, Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, List of Contracting States as of 27-5-1999, at *http://www.asser.nl/ica/nyca-enq.htm* (last visited June 9, 2003).

enforcement of awards, applies to honoring agreements to arbitrate that are covered by Article II); van den Berg, *supra,* at 65–66 (noting that the reciprocity principle, in accordance with Article I(3) of the Convention, applies only to the enforcement of arbitral awards).

Mindful of the potential internal tension between the statutory purposes described above, the Court cannot shut its eyes to the unequivocal language expressed by the parties in the Partnership Agreement's commitment to arbitrate disputes that the litigants in this case acknowledge having entered. Nor should the Court thereby hold itself powerless to devise an adjudication that gives legal effect to what the parties agreed, and that also pays due homage to the spirit and salutary goals of the FAA. The Court concludes that such a resolution is achievable here by staying further litigation in this case.

With these observations as a backdrop, the Court examines two courses it considered toward a resolution of the question at hand: one interpretive, and the other involving the exercise of inherent judicial authority.

### 1. *Stay Pursuant to FAA § 3*

■ The interpretive approach is predicated on the Court's conclusion that, in fact, because the Partnership Agreement here calls for arbitration in a non-contracting state, it is not one that falls within the application of the provisions of the Convention and its Enabling Act, and that review of the issues presented in Defendants' request for a stay may then properly be considered under the provisions of Chapter 1. On that analysis, the Court would not be precluded by § 3 from staying the instant litigation in recognition of the parties' commitment to arbitrate the underlying controversy, to the extent doing so would not be inconsistent with the

Convention and the Enabling Act. The Court concludes that issuing a stay would pose no such conflict in this case.

DaPuzzo argues that, on its face, staying this action in deference to arbitration proceedings conducted in a non-signatory forum designated by the parties' arbitration agreement would conflict with the Convention. This result follows, according to DaPuzzo, because inasmuch as a court cannot, consistent with the Convention, validly compel arbitration in a non-contracting state, it is not empowered to do so indirectly by staying litigation and leaving the party invoking its jurisdiction with no option but to commence arbitration in the non-signatory forum. Thus, DaPuzzo construes the Court's authority to stay litigation as being effectively coextensive with its power to compel arbitration of a dispute. In other words, on this theory, because under the Convention the Court cannot compel arbitration in a non-signatory state designated in an arbitration agreement, the matter is not "referable to arbitration" as defined under 9 U.S.C. § 3, and consequently the action would not qualify for exercise of the Court's authority to stay litigation either under Chapter 2 and the Convention or Chapter 1 of the FAA.

DaPuzzo's argument embodies several fallacies. The Court has already ruled that the arbitration agreement in this case does not fall within the ambit of the Convention because the forum in which the arbitration is intended to take place is a non-contracting state. Accordingly, the Court cannot compel arbitration in the Bahamas pursuant to Chapter 2. But that determination does not end the inquiry here, as DaPuzzo's hypothesis would suggest, because as already noted, the exercise of the Court's jurisdiction in the instant matter is not founded solely on Chapter 2, but has an independent basis in the parties' diversity of citizenship. In

consequence, if the agreement here drops out of the reach of the Court's jurisdiction under Chapter 2, it may still fall into the fold of Chapter 1 for other appropriate relief to the extent that such relief is not inconsistent with any provisions or underlying purposes of the Convention and the Enabling Act.[15] Accordingly, because the Court lacks authority, by operation of either FAA Chapter 1 or Chapter 2, to enforce the arbitration clause at issue here in accordance with its terms, that does not mean that the Court is thereby automatically deprived of jurisdiction to grant any other appropriate remedy applicable under Chapter 1 to the parties' controversy.

Second, neither the plain language nor intent of the FAA supports DaPuzzo's interpretation of the phrase "referable to arbitration" contained in 9 U.S.C. § 3. The language of § 3 itself makes clear that the term "referable to arbitration" is defined not by reference to whether the court in which the litigation is pending is empowered to compel arbitration of the particular dispute, but to whether the issue before the court involving the terms of an arbitration agreement is referable to arbitration as provided *"under such an agreement."* 9 U.S.C. § 3 (emphasis added). The term "referable" should not be taken to mean that a court order directing the parties to arbitrate must be a prerequisite to their ability to proceed to arbitration in accordance with their contract; in most instances, parties to a contract, on their own directive and without any judicial intervention, are free to refer their dispute to

arbitration as provided for "under such an agreement." *Id.*

Moreover, the scope of the district court's power to compel arbitration is defined not in § 3, but in § 4 of Chapter 1 and § 206 of Chapter 2. Consequently, a court considering a stay must look in the first instance not to whether the applicable provision of Chapter 1 or the Convention and Chapter 2 grants it power to refer a matter to arbitration in the particular instance, but to whether the agreement by its terms makes provision for arbitration of the specific issue. If so, the dispute should be regarded as "referable to arbitration," if not by the court where the litigation is pending—which, conceivably, in accordance with the terms of the arbitration clause, may lack authority under § 4 to order the parties to proceed to arbitration in a forum outside its district—then by some other legal authority in some other jurisdiction designated in the forum selection clause.

This reading is consistent with the language of § 4 and its interpretive jurisprudence. Where an arbitration agreement contains a forum selection clause, a court may not order arbitration to occur beyond its district, but may order a stay. *See Oldroyd*, 134 F.3d at 75–76 (noting that a court asked to stay proceedings pending arbitration must resolve, among other things, whether the parties agreed to arbitrate and the scope of that agreement; and if that court concludes that some, but not all, of the claims in the case are arbi-

---

15. Chapter 2 is not an exclusive source of judicial authority even with regard to agreements encompassed by its mandate. As noted above, in some respects there is "overlapping coverage" between the Convention and the FAA. *Bergesen,* 710 F.2d at 934; *see also Jain,* 51 F.3d at 690 (noting the absence in 9 U.S.C. § 206 of an explicit congressional statement making § 206 the exclusive method by which courts could order arbitration). On this rea-

soning, Chapter 2 does not constitute the exclusive source of authority for the court to stay litigation involving an arbitration agreement related to an international commercial transaction. *See Scherk,* 417 U.S. at 519–20, 94 S.Ct. 2449 (reversing a denial of a motion to dismiss or stay the action in favor of arbitration abroad under an application of Chapter 1 rather than pursuant to the Convention and Chapter 2).

trable, it must then decide whether to stay the balance of the proceedings pending arbitration); *Provident Bank,* 141 F.Supp.2d at 315; *Oil Basins,* 613 F.Supp. at 487; *see also Scherk,* 417 U.S. at 519–20, 94 S.Ct. 2449; *Jain,* 51 F.3d at 690; *Snyder,* 736 F.2d at 420.

Where a federal court lacks authority pursuant to 9 U.S.C. § 4 to compel arbitration outside its district, the court may still determine that the dispute nonetheless remains "referable to arbitration" elsewhere, if a forum is designated, and must then order a stay instead, thereby leaving the parties free to pursue their contractual rights and remedies in the appropriate venue. But in that event the court does so "under such an agreement." 9 U.S.C. § 3. In other words, the court acts to enable referral in accordance with the terms of the arbitration agreement's forum selection provision, albeit potentially by a court in another jurisdiction that is authorized to enforce the agreement, if a particular forum is designated, or by the court where the action is pending if no arbitration venue is specified by the parties. *See Snyder,* 736 F.2d at 419–20; *Oil Basins,* 613 F.Supp. at 487. Nothing in 9 U.S.C. § 3 or in Chapter 2 further defines or delimits how a dispute may be referable to arbitration, or suggests that for the purposes of granting a stay of litigation, courts are precluded from deeming a matter "referable to arbitration" under the terms of an arbitration clause on the ground that the designated forum is a non-signatory of the Convention.

In consequence, the Court finds no inherent conflict in the instant case between its denial, as precluded by both Chapters 1 and 2 of the FAA, of an order to enforce the agreement in question and compel arbitration in a forum that is not a contracting party to the Convention, and its granting a stay of the litigation, as permissible under Chapter 1, in order to enable the parties either to arbitrate or otherwise resolve the dispute at hand.

On this point, it bears considering that even in cases where the Convention acts as a bar to an order compelling arbitration in a non-signatory country, it generally does so because a court in a signatory state cannot give extraterritorial force to an order the effects of which the non-contracting state has not by treaty bound itself to recognize and enforce. There is no basis in the language of the Convention or the Enabling Act to construe the denial of recognition to an arbitration clause designating a non-signatory as a forum for arbitration as designed to render such an arbitration agreement a nullity for all purposes, as DaPuzzo would have it, or as necessarily proscribing arbitration proceedings under the agreement from being pursued in the designated forum. Nor is there ground to regard the limitations on enforcement of arbitration that are permissible under the Convention as an implicit means to penalize the parties or a non-signatory state selected as a forum for arbitration.[16] In articulating the aims embodied in the Convention, the Supreme Court declared that:

> The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration

---

16. As noted above, the Convention's optional reciprocity provision that DaPuzzo cites in support of his proposition that granting a stay under 9 U.S.C. § 3 in this case would conflict with the Convention's goal of encouraging more states to adhere to it is contained in Article I(3), which specifically applies to enforcement of arbitral awards, and not to recognition of agreements to arbitrate. *See Smith/Enron,* 198 F.3d at 94; *van den Berg, supra,* at 65–66.

agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.

*Scherk,* 417 U.S. at 520 n. 15, 94 S.Ct. 2449. This construction speaks affirmatively of a primary objective to foster favorable treatment of arbitration agreements among signatory countries; it evinces no purpose to nullify such agreements altogether, and thereby preclude arbitration from occurring, in non-contracting states. *See id.* at 519, 94 S.Ct. 2449 ("The invalidation of such an agreement in the case before us would not only allow the respondent to repudiate its solemn promise but would, as well, reflect a 'parochial concept that all disputes must be resolved under our laws and in our courts.... We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.'" (quoting *M/S Bremen,* 407 U.S. at 9, 92 S.Ct. 1907)).

The more likely intent of the restriction barring federal court orders compelling arbitration abroad is driven by more practical considerations: that the non-contracting state has not agreed to recognize and enforce an order directing arbitration entered by a foreign jurisdiction. For a court to direct otherwise, therefore, potentially may offend principles of international comity, and thus may improvidently commit the court and the parties to an exercise in futility. But while a non-contracting state may not be obligated to honor the orders of a foreign court directing parties to pursue arbitration in the non-signatory forum, that state may still have the legal processes in place manifesting a public interest in enforcing contractual rights and duties invoked by persons subject to that state's jurisdiction.[17]

Here, under the Court's reading of the interplay between Chapters 1 and 2 and the Convention, and the proper scope of the applicability of those provisions, though the Court does not enforce an arbitration clause that calls for performance in a non-signatory forum, that determination does not mean that the Court could not at the same time honor the spirit of the FAA as a whole, and leave the parties otherwise free to pursue their contractual arbitration commitment by its terms. Such a course would neither conflict with the letter and purposes of the Convention, nor, should the parties elect to arbitrate pursuant to their agreement, invade the territorial province of a sovereign non-contracting state through an unwarranted order directing arbitration.

Finally, as a practical matter, the exercise of jurisdiction to compel arbitration cannot be equated with that entailed in staying an action. The two judicial prerogatives are qualitatively different. A court's power to direct parties to arbitrate derives from statute and presupposes a valid arbitration agreement. Ordinarily, an order compelling arbitration serves affirmatively to mandate only one result: in order to comply, the parties must proceed to arbitration pursuant to their agreement or as commanded by the court. The Supreme Court, in recognizing the differences in scope and effects between FAA § 3 and § 4, underscored this distinction: "[T]here is no reason to imply that the power to grant a stay is conditioned upon the existence of power to compel arbitration in accordance with Section 4 of the

17. Defendants cite to a statute of the Bahamas relating to arbitration that purportedly would provide a forum to address DaPuzzo's claim. (*See* An Act for Amending and Consolidating the Enactments Relating to Arbitration, Chapter 168, Statute Law of the Bahamas 1987 Revised Edition, *reprinted in* Notice of Motion, Ex. 1.)

act.... There is ... strong reason for construing the clause as permitting the federal court to order a stay even when it cannot compel the arbitration." *Shanferoke,* 293 U.S. at 453, 55 S.Ct. 313.

A court's decision to stay litigation has no comparable direct coercive effect. While it may facilitate or usher arbitration, a stay of an action does not necessarily *require* that outcome. *See Kulukundis,* 126 F.2d at 987 (noting the difference between an order staying an action and one directing specific performance of a contractual obligation to arbitrate, the Second Circuit declared: "The first merely arrests further action by the court itself in the suit until something outside the suit has occurred; but the court does not order that it shall be done. The second ... affirmatively orders that someone do (or refrain from doing) some act outside the suit."). To be sure, a stay may accord the parties a sobering cooling-off climate, and the procedural framework and encouragement conducive for arbitration in accordance with their agreement. And it may open doors and clear pathways to other options as well. A stay of an action may offer opportunities for the parties to reassess disagreements over jurisdiction, venue or procedures and accommodate their differences in other ways, or provide the time necessary to readjust their contractual rights and duties so as to resolve the underlying dispute without further litigation, or indeed even without arbitration.

Moreover, as discussed below, unlike the statutory and contractual grounding that legitimate the power to compel arbitration, a court's authority to stay litigation has its own separate discretionary footing in judicial economy. If arbitration does proceed while the litigation remains on hold, the potential for conflicting results and attendant costs entailed in different proceedings may be obviated, and the outcome of issues

adjudicated in arbitration may be applied to simplify or entirely resolve matters still pending before the court.

Admittedly, there is limited authority directly on point with respect to the narrow issue here presented. Hence, the Court acknowledges that the interpretation it poses in this regard is not clearly settled in law. Nonetheless, the Court finds that the solution most fitting and responsive to the uncertainties raised by this case will not be found in entirely disregarding the Bahamas arbitration clause here at issue—as if it did not exist—and proceeding to consider the litigation DaPuzzo instituted in this Court in the face of his commitment to arbitrate disputes in the Bahamas.

2. *Inherent Discretion to Stay Litigation*

 On the premise that the dispute at hand does not fall squarely within the four corners of the FAA, and thus is not enforceable under either Chapter 1 or Chapter 2, the Court may exercise discretion attendant to its power to manage its docket effectively, so as to stay this action and dismiss it without prejudice pending further proceedings consistent with the parties' prior or subsequent understandings. *See Nederlandse Erts–Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440, 441–42 (2d Cir.1964) (noting that a district court has inherent power to grant a stay even when authority to do so is not supported under the terms of the FAA) (citing *Landis v. North Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936)); *see also Europcar Italia, S.p.A. v. Maiellano Tours, Inc.,* 156 F.3d 310, 316 (2d Cir.1998) ("'[T]he District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.'" (quoting *Clinton v. Jones,* 520 U.S. 681, 706–07, 117 S.Ct. 1636, 137 L.Ed.2d 945

(1997))); *WorldCrisa,* 129 F.3d at 76 (recognizing the inherent power of district courts to stay litigation "despite the inapplicability of the FAA."); *see also Oil Basins,* 613 F.Supp. at 488 (dismissing complaint without prejudice where the court, absent an explicit forum selection provision, compelled arbitration in New York subject to reopening in the event the arbitrators determined that Australia would be a more convenient forum).

In deciding upon this course, the Court considers first the proper respect that must be accorded to the federal policy favoring arbitration where the parties have manifested a clear intention to adjudicate their underlying dispute through more economical means rather than through the rigors and unmerciful costs of litigation. *See Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. 927; *Chelsea Square,* 189 F.3d at 294; *Threlkeld,* 923 F.2d at 248. Second, this is not a case in which the Court harbors any doubt concerning whether the parties' pertinent agreement contained an arbitration provision, or whether or not, if it did, there is any ambiguity concerning the applicability of the clause to the dispute at hand. In fact, it is undisputed that the parties unequivocally committed to resolve any controversies arising out of their partnership relationship and attendant investment transactions by arbitration; the only points in contention relate to the proper forum and applicable procedures.

Third, it is also clear to the Court that adjudication of this dispute is itself encompassed by the terms of the arbitration provisions at issue, under either party's reading of the underlying arbitration commitment. Contrary to DaPuzzo's contention, both the applicable rules governing the arbitration and his allegations of fraud in the inducement are arbitrable issues within the scope of either provision. He makes no claim that the arbitration provision itself was separately procured by fraud, but rather seeks to validate it as an independent agreement. *See Prima Paint,* 388 U.S. at 402–04, 87 S.Ct. 1801 (holding that under the language of the relevant arbitration agreement and policies of the FAA, the issue of fraud in the inducement was an arbitrable question); *Robert Lawrence,* 271 F.2d at 410–11 ("[A]rbitration should not be denied or postponed upon the mere cry of fraud in the inducement, as this would permit the frustration of the very purposes sought to be achieved by the agreement to arbitrate."); *see also S.A. Mineracao da Trindade–Samitri v. Utah Int'l, Inc.,* 745 F.2d 190, 195 (2d Cir.1984).

Fourth, for the reasons discussed above, the Court is persuaded that the more complete and compelling manifestation of the parties' legitimate expectations and understanding concerning arbitration is that expressed in the text of the Partnership Agreement that DaPuzzo actually signed in 2001. Thus, even if any valid ground existed in 1998 for DaPuzzo to invoke the CIM's arbitration language as creating an ambiguity and expressing his understanding of the operative commitment—because allegedly he had not been provided a copy of the Partnership Agreement[18]—any doubts or uncertainties DaPuzzo may have been laboring under should have been dispelled when he reaffirmed the Partnership Agreement by personally executing it three years later.

Fifth, in declining to proceed with the instant action at this time, the Court sees

---

18. DaPuzzo acknowledges having received a copy of the CIM. (*See* DaPuzzo Aff. ¶ 6, at 2–3.) However, the Subscription Agreement, the same written document by which DaPuzzo admits having received and read the CIM, contains a similar acknowledgment encompassing the Partnership Agreement.

no undue prejudice to DaPuzzo. It cannot come as a complete surprise to DaPuzzo, given the Partnership Agreement's arbitration provision he freely accepted, that a court would defer consideration of litigation he commenced in the face of the arbitration clause in order to afford the parties reasonable opportunities to explore dispute resolution alternatives more consistent with their consensual arrangements. The case is still in the very early stages of pretrial proceedings, so that as yet there could not have been an exceptional outlay of resources, nor could inconvenience flow from pausing the hostilities in this forum at this point.[19]

It is inconceivable to the Court that exploring alternative means to adjudicate the instant dispute, even in a foreign state, would materially enlarge costs, prolong resolution or otherwise visit more severe hardship on the parties than proceeding with litigation in this forum. On the other hand, the prejudice to Defendants of being compelled to litigate this action, and being deprived of the benefit of the bargain they sought in the parties' arbitration agreement, would be substantial. Such prejudice and hardship would be enhanced were Defendants to elect, in response to an order directing arbitration in New York, to institute arbitration proceedings themselves, or even countervailing litigation, in the Bahamas.

DaPuzzo's proposition would present the Court with a choice between two courses, both grounded on doubtful support and fraught with more severe implications: to ignore the parties' explicit agreement to resolve their dispute through arbitration and permit DaPuzzo to proceed with the instant litigation, or to compel arbitration in this District under the AAA rules. The Court's exercise of jurisdiction so as to entertain this litigation would not only fly in the face of the parties' undisputed commitment to arbitrate, but would also clear the way to extensive preliminary motion practice to address substantial issues touching upon the Court's subject matter and personal jurisdiction and challenging whether the complaint states a sufficient claim. Not infrequently, when one party perceives litigation as unwarranted and contravening the parties' contractual rights and duties, that party will commence more litigation through parallel pro-

---

**19.** The Court takes into account that, under the terms of the Convention and the Enabling Act, in the event DaPuzzo were to receive an arbitral award in the Bahamas, he would be unable to enforce it in the United States. *See National Iranian Oil*, 817 F.2d at 335; Swisher, *supra*, 47 Wash. L.Rev. at 457. But that is a consequence that could prevail in regards to any arbitral award rendered in a dispute not covered by the Convention. It also does not mean that DaPuzzo would not have recourse to enforce the award in the Bahamas. Moreover, if the arbitral award were to be reduced to a final judgment in the Bahamas, arguably that judgment may be entitled to recognition and enforcement not as an arbitral award under the Convention but as a foreign judgment. While the United States is not a party to any international treaties concerning the recognition and enforcement of foreign judg-

ments, *see* International Judicial Assistance, Notarial Services and Authentication of Documents, *http://www.travel.state.gov/judicial_assistance.html* (last visited June 9, 2003); Cedric C. Chao and Christine S. Neuhoff, *Enforcement and Recognition of Foreign Judgments in United States Courts: A Practical Perspective*, 29 Pepp. L.Rev. 147, 148 (2001), and there are no federal statutes governing the enforcement and recognition of foreign judgments, Chao and Neuhoff, *supra*, at 148, "[u]nder the law of the state of New York, a foreign judgment is enforceable if it is 'final, conclusive and enforceable where rendered....'" See*transport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 583 (2d Cir.1993) (quoting N.Y. Civ. Prac. L. & P. § 5302 (McKinney 1978)); *see Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 715 (2d Cir.1987).

ceedings in another forum as a counter-measure motivated by the latter party's search for tactical advantage, or desire to vex, or simply to enforce the parties' underlying benefits and obligations more strictly in accordance with the terms of their agreement. The consequence of such maneuvers, opening the prospect of generating conflicting rulings in different jurisdictions, is always to impose heavier burdens not only on the parties, but on the court and the public at large.

Ordering arbitration to proceed in this District, on the other hand, would demand a ruling grounded on a construction of the relevant documents that, assessed in the context surrounding this case, strains reasonable contract interpretation and is thus tenuous at best. Either of these alternatives would do greater violence to the parties' agreement to arbitrate than the choice of affording the parties more opportunity voluntarily to honor the clause contained in the Partnership Agreement. This provision gives fuller expression to the parties' intent in that it not only mandates arbitration of partnership disputes but, unlike the CIM language, explicitly designates a specific venue and disclaims a waiver of judicial proceedings where appropriate. Temporally, that agreement also represents DaPuzzo's most recent freely-negotiated reaffirmation of his commitment to arbitrate.

Finally, it does not follow that because a court lacks authority to compel arbitration under either Chapter 1 or Chapter 2 of the FAA, the arbitration clause in an otherwise valid agreement is necessarily void for all purposes, and that a litigant in that situation, as DaPuzzo maintains, is then left either entirely without a remedy or with only a choice to litigate in another forum. The unenforceability of an arbitration clause in a federal court does not mean that the agreement cannot be given effect in the designated foreign state, even if it is a non-signatory of the Convention. Such a course was implicitly recognized by the Fifth Circuit in *National Iranian Oil*. There, the Circuit Court rejected the plaintiff's claim that by instituting litigation in the United States it had waived its right to arbitrate in the designated forum—a non-signatory of the Convention. 817 F.2d at 332 (noting also that plaintiff in fact had attempted and may still have been attempting to compel arbitration in Iran). Nothing bars DaPuzzo from voluntarily pursuing the arbitration procedure which he freely accepted in the Partnership Agreement, by which he accepted to be bound, and which he formally executed. Nothing precludes the parties, under appropriate circumstances, from engaging in negotiations towards a stipulated resolution of their disagreement over the venue and rules applicable to the arbitration commitment to which they both concede they are committed, including, if necessary, by modifying their agreement or waiving arbitration altogether, or from otherwise amicably settling the merits of their dispute outside of litigation.

Accordingly, the Court concludes that, because all of the disputes raised by DaPuzzo's claims in the action at hand are encompassed by the parties' arbitration agreement, these issues should be adjudicated in accordance with the parties' consensual understandings in whatever form or forum they deem appropriate after considering the Court's ruling. *See Milgrim v. Backroads, Inc.*, 142 F.Supp.2d 471, 476 (S.D.N.Y.2001) (noting that courts have the discretion to dismiss, rather than stay, an action when all of the issues raised in the litigation are within the scope of an arbitration agreement) (citing *Eastern Fish Co. v. South Pacific Shipping Co., Ltd.*, 105 F.Supp.2d 234, 241 (S.D.N.Y. 2000) and *Berger v. Cantor Fitzgerald Sec.*, 967 F.Supp. 91, 96 (S.D.N.Y.1997)).

Should, for example, Defendants refuse to honor their agreement to arbitrate in a timely manner or unreasonably delay or impede such proceedings; should arbitration not resolve all matters in dispute in this action but leave open particular issues subject to adjudication in this Court; should DaPuzzo obtain an enforceable award or final judgment rendered in DaPuzzo's favor in connection with the parties' dispute; or should the parties otherwise reach a settlement of the action that Defendants later refuse to honor, DaPuzzo may return to this Court to seek appropriate relief as permitted by law and consistent with the parties' applicable understandings. The Court shall retain jurisdiction to effectuate these purposes or enforce any such agreement.

### III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the Court's Decision and Order dated May 31, 2003 is amended to incorporate the discussion herein; and it is further

**ORDERED** that Defendants' motion to compel arbitration in the Bahamas is denied; and it is further

**ORDERED** that Defendants' motion to stay further proceedings in this action is granted; and it is further

**ORDERED** that DaPuzzo's motion to compel arbitration in New York is denied; and it is finally

**ORDERED** that this case is discontinued without prejudice provided that DaPuzzo may reinstate the action in the event: Defendants have unreasonably refused to comply with their obligation to arbitrate or otherwise resolve the parties' dispute in accordance with the terms of their prior or any subsequent agreement or otherwise to honor any such agree-

ments; or the parties proceed to arbitration and such arbitration does not resolve all matters in dispute in this action, but leaves open particular issues subject to adjudication in this Court; or any final award or judgment enforceable in this Court is rendered in DaPuzzo's favor in connection with the parties' underlying dispute.

The Clerk of Court is directed to close this case.

**SO ORDERED.**